## August Schendell v. Charles Rogan, Commissioner of the General Land Office.

No. 1021. Decided June 26, 1901.

1. **Public Lands—Classification and Appraisement—Powers of Commissioner.**

The acts of the Commissioner of the General Land Office in classifying and valuing land under article 4218b of the Revised Statutes and offering it for sale were conclusive on the State. (P. 595.)

2. **School Land—Reservation of Minerals.**

Articles 3498a, 3498n, of the Revised Statutes, reserving from sale all lands containing valuable minerals, were not intended to operate upon lands which had not been found to contain such deposits and were not apparently mineral lands. (Pp. 595-599.)

3. **Same—Purchaser—Affidavit—Statutes Construed.**

The requirement in article 3498n that the purchaser file an affidavit that there were none of the enumerated minerals on the land, with his application to buy "any of the lands embraced in article 3498a," refers only to the lands reserved from sale by that article, that is, those "containing valuable mineral deposits," and does not apply to lands classed as agricultural and not known to be mineral lands. (P. 596.)

4. **Same—Reservation of Minerals.**

The provision reserving minerals from sale applies only to purchase of land once classed as mineral, by one making oath to his belief that it is not so in fact, for the purpose of buying it under the general law, as agricultural and not as mineral land; except in such purchases the minerals passed with the land. (Pp. 595, 596.)

5. **Statutory Construction.**

See this case for application of the maxim that all laws relating to the same subject and enacted at the same session are to be construed together and practically as one act. Also that the construction placed upon a statute by the legislative and executive departments should be followed by the judiciary. (Pp. 597, 598.)

6. **School Land—Mandamus.** .

A purchaser under the law of 1895, of land classified as agricultural, and who has complied with all the requirements of purchase for lands of that class, may have mandamus to compel the Commissioner of the General Land Office to issue him a patent, though he has made no affidavit that the land contains no mineral deposits, as required by article 3498n of the Revised Statutes. (Pp. 590, 591, 598.)

Original application for writ of mandamus to the Commissioner of the General Land Office.

*Bennett & Jones,* for relator.—Sections 1, 10, and 14 of chapter 127 of the Acts of the Twenty-fourth Legislature refer and apply to public free school lands known, designated as, or thought to contain valuable deposits of some one or more of the minerals embraced in said act before the purchase of said land,—lands lying in mineral districts, —and not to the great mass of public free school lands lying in the

agricultural, grazing and timbered districts, and examined and classified by authority of the Commissioner of the General Land Office according to the provision of chapter 47 of the same Legislature as agricultural, grazing, or timbered lands and offered for sale and bought in good faith as such, although minerals named in said act may be discovered thereon after the purchase of the same; and these lands designated, known, or thought to contain minerals, constitute an exception to the lands embraced in section 1, chapter 47.

The reservation of minerals in section 14 above mentioned, if operative at all, applies to lands known by the purchaser at or before the time of his purchase to contain valuable deposits of mineral, or lands being in mineral districts and designated by the geological and mineralogical survey as apparently mineral-bearing land.

*Frank Andrews, Baker, Botts, Baker & Lovett,* and *H. G. King,* also for relator.—The sale of the land in controversy was expressly authorized by law, and all conditions thereof having been complied with, relator is entitled to the relief prayed.

The acts providing for the geological and mineralogical survey, and making special provision for the sale of mineral-bearing lands thereby discovered, and the development of the same, were not intended and did not operate to withdraw all public school, university, and asylum lands from sale, as provided by other laws.

The acts making special provision for the sale and development of mineral-bearing lands related only to lands in known mineral territory, or found to possess valuable minerals before the sale thereof as agricultural, pasturage, or timbered lands, classed and sold as such by the Commissioner of the General Land Office, pursuant to other laws. Deffeback v. Hawke, 115 U. S., 392; Davis v. Weibbold, 139 U. S., 507; Cowell v. Lammers, 10 Sawyer, 246; Colorado C. & I. Co. v. U. S., 123 U. S., 307; United States v. Iron & S. M. Co., 128 U. S., 673; Ah Yew v. Choate, 24 Cal., 562; Barden v. Railway, 154 U. S., 288. Railway v. Walker, 47 Federal Reporter, 683, holds that further discovery of minerals after patent to Northern Pacific Railway does not divest title out of the railway company. It has been uniformly held that discovery of mineral after patent did not affect the title of the patentee to either the lands or the minerals. Bonner v. Meikle, 82 Fed. Rep., 704; Dower v. Richards, 151 U. S., 663; Carter v. Thompson, 65 Fed. Rep., 330; Migeon v. Railway, 77 Fed. Rep., 256. In this State the award of the land to the proposed purchaser and his compliance with the law has always been held to vest the land in the purchaser, subject only to his performance of his future obligations, just as effectually as if a patent, which is but the evidence of his title, had issued to him as provided by law.

The Commissioner of the General Land Office in the exercise of the power and performance of the duty imposed upon him by law, having found and determined that the land was agricultural, and having sold the same as such, his finding and action is conclusive. Holloman

v. Peeples, 1 Texas, 673; Hancock v. McKinney, 7 Texas, 384; Jenkins v. Chambers, 9 Texas, 167; Styles v. Gray, 10 Texas, 503; Ruis v. Chambers, 15 Texas, 586; Herndon v. Robinson, 15 Texas, 599; Johnston v. Smith, 21 Texas, 722; Decourt v. Sproul, 66 Texas, 370; Railway v. State, 77 Texas, 388; Bank v. Terrell, 78 Texas, 450; United States v. Arredondo, 6 Pet., 691; United States v. Railway, 98 U. S., 334; Railway v. Railway, 112 U. S., 414; Town of Coloma v. Eaves, 92 U. S., 490; Maxwell Land Grant Case, 121 U. S., 325; Coal Co. v. United States, 123 U. S., 207; United States v. Budd, 144 U. S., 154; United States v. Railway, 142 U. S., 615; United States v. Land Co., 148 U. S., 31; United States v. Railway, 148 U. S., 362; United States v. Railway, 150 U. S., 1; Chandler v. Mining Co., 149 U. S., 79; Barden v. Railway, 154 U. S., 288; Smelting v. Kemp., 104 U. S., 636; Steele v. Smelting Co., 106 U. S., 447; Heath v. Wallace, 138 U. S., 573; 140 U. S., 400; 158 U. S., 166; 170 U. S., 339; 125 Cal., 164.

Minerals are not reserved in the sale of lands by the State, but go to the purchaser with the soil. Cowell v. Lammers, 10 Sawyer, 257; Davis v. Wiebbold, 139 U. S., 525. At common law all minerals, except gold and silver, which are reserved to the crown, belong to the owner of the soil. 1 Blackst., 294; 3 Kent, 378; Williams on Real Prop., 14; Brown v. Spillman, 155 U. S., 669, 670; Sloam v. Furnace, 29 Ohio St., 568; Whittaker v. Brown, 46 Pa. St., 197; Lyons v. Gormley, 53 Pa. St., 261; Caldwell v. Fulton, 31 Pa. St., 475; Salt Co. v. Neel, 54 Pa. St., 66; Lykens v. Dock, 52 Pa. St., 232; Stoughton's Appeal, 88 Pa. St., 198; Kier v. Peterson, 41 Pa. St., 357; Gill v. Weston, 110 Pa. St., 312; Hartwell·v. Camman, 10 N. J. Eq., 128.

Section 7, article 14, of the Constitution of 1876, expressly "releases to the owner or owners of the soil all mines and minerals that may be on the same," etc. We understand it will be contended, however, that such constitutional provision only operated to release minerals in lands theretofore sold. But this court has already held otherwise. State v. Parker, 61 Texas, 265; Shreveport v. Cols, 129 U. S., 36; Orr v. Rhine, 45 Texas, 345.

*J. N. Votaw*, also for applicant.—An exception or reservation in a deed patent, or legislative grant, is always to be taken most favorably for the grantee; and if not certain in its terms, the grantee shall have the benefit of the defect. Jackson v. Hughes, 3 Johns., N. Y., 375; Grafton v. Moir, 130 N. Y., 465.

By the award of school land to an applicant to purchase who subsequently complies with all the requirements of the law, a title is conferred by which the State is as firmly bound as by a patent, and takes effect in presenti. The facts of the award and compliance by relator being admitted by respondent, relator's title is prima facie perfect, with every presumption in his favor. Van Wicks v. Knevals, 106 U. S., 360; Railway v. Baldwin, 103 U. S., 426.

An exception or reservation of a property right is extinguished by

an assignment of the property; the assignee takes a title freed from the rule of property adopted by the assignor. Boggs v. M. M. Co., 14 Cal., 360; Moore v. Shaw, 17 Cal., 199; Smisson v. State, 71 Texas, 222; Swenson v. Taylor, 80 Texas, 584.

School land classed as agricultural could be purchased at the date of the application of relator's vendor without reference or respect to title 71 of the Revised Civil Statutes of Texas. Davis v. Wiebbold, 139 U. S., 507; Deffeback v. Hawks, 115 U. S., 392; Cowell v. Choate, 24 Cal., 562; Barden v. Railway, 154 U. S., 315.

Where land is awarded as agricultural land, under the classification of the officer appointed by law for that purpose, the subsequent discovery of mineral will not defeat the title, and the classification by the proper officer is conclusive. Ah Yew v. Choate, 24 Cal., 562; Doll v. Meador, 16 Cal., 324; Boggs v. Merced, 14 Cal., 279; Moore v. Swan, 17 Cal., 199; Barden v. Railway, 154 U. S., 326; Davis v. Wiebbold, 139 U. S., 507, and cases there cited; Cowell v. Lammers, 21 Fed. Rep., 200.

*C. K. Bell*, Attorney-General, and *T. S. Reese*, Assistant, for respondent.—A reservation of mineral lands from sale is legal. Barden v. Railway, 154 U. S., 319. Even if patent has been issued it may be canceled because the land conveyed by it was reserved from sale on account of the existence of minerals therein. Mullan v. United States, 118 U. S., 277.

The act of the officer in awarding land, or even in issuing a patent, is ministerial and not judicial. If he issue a patent for land reserved by law, such patent is voidable. Mullan v. United States, 118 U. S., 279. The law with reference to the sale of lands must be complied with strictly, or the proposed purchaser acquires no rights. Snyder v. Nunn, 66 Texas, 255.

The Act of March 29, 1889, page 116, of the Acts of the Twenty-first Legislature, reserved from sale or other disposition, except as provided in said act, all the public school, university, asylum, and public lands containing valuable mineral deposits. Section 15 of said act provided that where application was made to buy or obtain title to any of the lands described, except where the application was made under the said act, the applicant should make oath that there was not, to the best of his knowledge and belief, any of the minerals embraced in said act thereon. Section 10 of the act referred to was amended by the Act of May 2, 1893, page 100, Acts of the Twenty-third Legislature. The section as amended was a complete act, so far as school land containing oil and similar substances, as distinguished from silver and other valuable metals, is concerned.

After prescribing the method by which lands containing oil and the other substances mentioned could be sold, the section, as amended, provided that all said lands should be reserved from sale or other disposition than under that act, and that where application was made to buy any of the lands, except under that act, the purchaser should

swear that "there are none of the minerals named in the act on said land, so far as he knew or had reason to believe or did believe."

The Act of 1889, as amended by the Act of 1893, was re-enacted in 1895, without any material change, page 197, Acts of the Twenty-fourth Legislature. The second section of the Act of 1895, which was the law in force at the time of the attempted purchase of the land which is the subject matter of this litigation, required the Commissioner of the General Land Office, immediately upon the passage of the act, to have a map made showing the location of all of the public school lands which were unsold at that date, and it was made the duty of the geological and mineralogical survey to examine all such lands, as soon as practicable thereafter. This clearly shows that it was the intention of the Legislature that all of said lands should be classified into such as were and were not apparently mineral bearing lands.

In subsequent sections of the act the manner in which the lands which were mineral-bearing were to be acquired was specified, but it was evidently not the intention of the Legislature to take all of said lands off of the market during the many years which must elapse while the geological and mineralogical survey was examining and classifying said lands. Hence it was provided that one who desired to might buy the lands under any other law, but in order to enable him to do so he was required to make the affidavit referred to.

If this is not the proper construction to be placed upon the provisions of the law which have been quoted, it would necessarily follow that all of the public school lands would have to be reserved from sale until it had been classified by the geological and mineralogical survey, or else the law, which reserved from sale or other disposition the lands containing valuable mineral deposits, would be inoperative as to a large proportion, if not as to practically all, of said lands.

Section 10, after prescribing the method in which, and the price at which, the lands containing oil and the other substances named might be sold, provides that all said lands are reserved from sale or other disposition than under the act of which it is a part. There could be but one meaning to this provision, and that is, that if the school lands contain valuable deposits of the minerals named, then the said lands are to be reserved from sale, except at the price and under the conditions mentioned. If, then, any of the lands at any time before patent is issued, are found to contain oil, or the other substances named, no patent could be issued for them, but if patent has issued already, the State alone could complain of the fact that they had been improperly patented. This the State could do, as has been decided in the cases referred to above.

The latter part of section 14 provides that any sale or disposition of said lands should be understood to be with the reservation of the minerals thereon to be subject to location as therein provided. This must mean any sale except when the land is sold as mineral land, in which case the purchaser is required to pay $10 per acre where the

land is over ten miles from a railroad and $15 per acre if the land is situated within ten miles or less of a railroad. Of course where the land is sold as mineral land, and at the price named, the purchaser gets the land absolutely without any reservation on the part of the State of the minerals in the lands, but section 14 expressly provides that where it is sold, except under the act of which it is a part, the sale will be with the reservation mentioned. This requirement strengthens the contention as to the necessity of the affidavit which has been referred to.

The construction of a statute by a department charged with its execution is not conclusive and binding upon the courts. Merrett v. Cameron, 137 U. S., 551; United States v. Graham, 110 U. S., 219; Van Loon v. Lyons, 61 N. Y., 22; Railway v. State, 81 Texas, 602.

BROWN, Associate Justice.—By original proceeding in this court, the relator seeks a mandamus to compel the Commissioner of the General Land Office to issue to him a patent to fractional section 62 of the public free school land situated in Fort Bend County, and alleges that said land, being duly surveyed, was by the Commissioner of the General Land Office classified as agricultural land and valued at $2.50 per acre. The land was then placed upon the market in conformity with the Act of 1887, entitled, "An act to provide for the sale of all land heretofore or hereafter surveyed and set apart for the benefit of the public free schools, the university, and the several asylums, and the lease of such lands and of the public lands of the State, and to prevent the free use, occupancy, unlawful inclosure, and unlawful appropriation of such lands, and to prescribe and provide adequate penalties therefor." The petition alleges all the facts necessary to show that the Commissioner of the Land Office complied fully with the law in placing the land upon the market. The petition alleges that on the 1st day of April, 1896, Wm. Armstrong settled upon the land in good faith and made application to the Commissioner of the Land Office for the purchase of the same, fully complying with all the requirements of the Act of 1895, entitled, "An act to provide for the sale of all lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools and the several asylums and the lease of such lands and of the public lands of the State, and the patenting of any part of the said lands for church, cemetery, or schoolhouse sites; and to prevent the free use, occupancy, unlawful inclosure, or unlawful appropriation of such lands, and to prescribe and provide adequate penalties therefor." It is alleged that the Commissioner of the General Land Office awarded the land to the said William Armstrong, and that he, the said Armstrong, continued to reside upon the said land as an actual settler for more than three years, paying all of the interest and charges accruing thereon, and within two years after the expiration of the said three years, he made and filed with the Commissioner of the General Land Office the proof necessary to entitle him to a patent for said land, after which the said William Armstrong

sold the land to the relator, who, on the 20th day of May, 1901, in accordance with the provisions of the said law, made, executed, and delivered to the Commissioner of the General Land Office his obligation for the unpaid part of the purchase money upon the said fractional section, by which he obligated himself to pay the said money in accordance with the terms of the original contract of William Armstrong, which said obligation of the relator was received and accepted by the Commissioner of the Land Office and was substituted for the original obligation of the said Armstrong. On May 21, 1901, the relator, desiring a patent upon the said land, paid to the Treasurer of the State of Texas all of the purchase money remaining unpaid upon the said fractional section, amounting to $173.67, taking the receipt of the Treasurer therefor, which receipt the said relator tendered, with the patent fees prescribed by law, to the respondent, the Commissioner of the Land Office, and demanded a patent to the said land; but the Commissioner of the General Land Office refused to accept the said receipt or the patent fee tendered and refused to issue to the relator a patent for the said land.

The petition alleges a compliance with the law by the Commissioner of the General Land Office in putting the land upon the market and by William Armstrong in making the purchase of the same, and by the relator in carrying out the contract after the land was conveyed to him, but does not allege that Wm. Armstrong, at the time he made his application for the purchase of the land, made "oath that there is not, to the best of his knowledge and belief, any of the minerals embraced in this title thereon," nor did the petition allege that the relator made the said oath at the time that he made application for the patent to the said lands. The respondent admits all of the facts alleged in the petition for mandamus and relies upon the proposition that it was necessary for Armstrong, in making the application to purchase the land and for the relator in making application for the title to the land, to make oath as above stated, and, having failed to do so, that no right accrued to Armstrong or to the relator. It is unnecessary for us to set out the minute particulars in which all of the provisions of the statute are alleged to have been complied with.

The Constitution and laws of the State of Texas have divided the public domain into free school lands, asylum lands, and university lands, each class being dedicated to a special purpose, all other lands being designated public lands. In 1883 the Legislature of the State undertook to formulate and put into operation a system by which the public free school, university, and asylum lands could be utilized by sale and lease for the maintenance of the several objects to which they had been set apart, and enacted a law entitled, "An act to provide for the classification, and lease of the lands heretofore or hereafter surveyed and set apart for the benefit of the common school, university, the lunatic, blind, deaf and dumb, and orphan asylum funds." Laws 1883, p. 85. The first and second sections of the act read as follows: "1. That all lands heretofore or hereafter surveyed and set apart for

the benefit of the common school, university, the lunatic, blind, deaf and dumb, and orphan asylum funds may be sold and leased as hereinafter provided. 2. There shall be and is hereby created a State Land Board, which shall be composed of the Governor, Attorney-General, Comptroller, Treasurer, and Commissioner of the General Land Office, who shall exercise the powers and perform the duties hereinafter prescribed." The law proceeded to regulate the manner in which the land board should classify and sell the land, requiring that all land "shall be classified as agricultural, pasture, and timber lands." At the same session, the Legislature passed a law entitled, "An act to provide for the disposition of the minerals in the public school, university, asylum, and public lands of the State of Texas." Laws 1883, p. 100. The first section of the act reads as follows: "That all minerals in the public school, university, asylum, and public lands of the State of Texas be and the same are reserved from the operation of the laws for the sale of such lands, and shall be used and disposed of for the benefit of the respective funds for which said lands are now set apart as hereinafter prescribed." The second section places these lands under the control of the land board.

In 1887, the Twentieth Legislature enacted a law under the following title: "An act to provide for the sale of all lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools, the university, and the several asylums, and the lease of such lands and of the public lands of the State, to prevent the free use, occupancy, unlawful inclosure, or unlawful appropriation of such lands, and to prescribe and provide adequate penalties therefor." Laws 1887, p. 83. The first section of that act is in these words: "That all lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools, the university, the lunatic asylum, the blind asylum, deaf and dumb asylum, and the orphan asylum, shall be sold and leased under the provisions of this act." The second section of the act gives to the Commissioner of the General Land Office full authority in the execution and enforcement of the law and authorizes him to make regulations and provide and promulgate all necessary forms for applications of sale or lease, with authority to call upon the Attorney-General to prepare such forms as he may find necessary in the execution of his duties. The law requires the Commissioner to appoint agents to examine and classify the said lands into agricultural, pasture, and timbered lands, and to place the value of each section thereon, making out and returning reports and plats of the different surveys and all things necessary to aid in the sale of the land. When the classification should be complete, the land was required to be placed upon the market for sale to actual settlers only, who were required to live upon the land for three consecutive years, and prescribed that the application for purchase should be accompanied with the affidavit of the purchaser, "stating that he desires to purchase the land for a home; that he has, in good faith, settled thereon; that he is not acting in collusion with others for the purpose of buying the

land for any other person or corporation, and that no other person or corporation is directly or indirectly interested in the purchase save himself." This law fully covered the subject and operated to repeal the law of 1883, which created the land board.

In the year 1889, the Legislature amended the law of 1887, but left in full force the parts before quoted. At the same session, there was enacted a law entitled, "An act to promote the development of the mining resources of Texas," the first section of which reserved from sale, except as therein specified, all the public school, university, asylum, and public lands containing "valuable mineral deposits." Rev. Stats., art. 3481. It was made the duty of the Commissioner of the General Land Office, immediately upon the passage of the act, to have a map made showing the location of all such lands as were then unsold, and it was made also the duty of the geological and mineralogical survey to examine all lands as soon as practicable thereafter and to designate such tracts as are "apparently mineral bearing, as mineral lands for the purposes of this act."

In 1895 the Legislature enacted a law providing for the sale and lease of the free school, university, and asylum lands, which is embraced in the Revised Statutes as title 87, chapter 12, from which we quote the following articles:

"Article 4218b. All lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools, the lunatic asylum, the blind asylum, the deaf and dumb asylum, and the orphan asylum shall be sold and leased under the provisions of this chapter.

"Article 4218c. The Commissioner of the General Land Office is hereby vested with all the power and authority necessary to carry into effect the provisions of this chapter, and shall have full charge and direction of all matters pertaining to the sale and lease of said lands, and their protection from free use and occupancy and from unlawful inclosure, with such exceptions and under such restrictions as may be imposed by the provisions of this chapter, or by the Constitution of the State. He shall, as soon as practicable, adopt such regulations not inconsistent with the Constitution or this chapter as may be deemed necessary for carrying into effect the provisions of this chapter, and may, from time to time, alter or amend such regulations so as to protect the public interest; but all regulations shall be submitted to the Governor for his approval before adoption or promulgation. He shall adopt all necessary forms of applications for sales or leases and all other forms necessary or proper for the transaction of the business imposed upon him by this chapter, and may, from time to time, call upon the Attorney-General to prepare such forms; and it shall be the duty of that officer to furnish the Commissioner of the General Land Office with such advice and legal assistance as may be requisite for the due execution of the provisions of this chapter; and it shall be the duty of such Commissioner to call upon the Attorney-

General for advice whenever there is any doubt as to the meaning of this chapter or any provisions thereof."

Article 4218e requires the Commissioner of the General Land Office, from time to time, to classify the lands belonging to the different funds named, "designating the same as agricultural, grazing, or timbered land, according to the facts in the particular case, and he may prescribe such regulations in reference thereto as he may deem necessary to secure a correct classification."

The duty of the Commissioner to sell and the terms and conditions of the sale are prescribed by article 4218j, as follows: "All sales shall be made by the Commissioner of the General Land Office or under his direction, and he shall prescribe suitable regulations whereby all purchasers shall be required to reside upon, as a home, the land purchased by them, for three consecutive years next succeeding the date of their purchase, except when otherwise provided. Such regulations shall require the purchaser to reside upon the land for three consecutive years herein mentioned and to make proper proof of such residence and occupancy to the Commissioner of the General Land Office within two years next after the expiration of the said three years by his affidavit, corroborated by the affidavit of three disinterested and credible persons. * * * Any person desiring to purchase land in accordance with the provisions of this chapter shall forward his application to the Commissioner, describing the land sought to be purchased, which application shall be accompanied with an affidavit of the applicant, in effect, that he desires to purchase the land for a home and has in good faith settled thereon, except where otherwise provided herein, and shall swear that he is not acting in collusion with others for the purpose of buying the land for any other person or corporation, and that no other person or corporation is interested in the purchase thereof."

"Article 4218k. Purchasers shall have the option of paying the purchase money for their lands in full at any time after they have occupied the same for three consecutive years; and when they have made such payment in full, together with the proof that they have occupied the land for three consecutive years, they shall receive patents for the same upon payment of the patent fee prescribed by law."

The Legislature, at its session of 1895, re-enacted in substance the Act of 1889, which reserved from sale lands containing minerals, both laws being embraced in the Revised Statutes as title 71. From the Act of 1895 we quote:

"Article 3498a. All public school, university, and asylum lands * * * containing valuable mineral deposits are hereby reserved from sale or other disposition except as herein provided, and are declared free and open to exploration and purchase, under regulations prescribed by law, by citizens of the United States and those who have declared their intention to become such.

"Article 3498b. It shall be the duty of the Commissioner of the General Land Office, immediately upon the passage of this title (act)

to have a map made showing the location of all public school, university and asylum lands which are unsold at that date, and it shall be the duty of the geological and mineralogical survey to examine all such lands as soon as practicable thereafter and to designate such tracts as are apparently mineral-bearing as mineral lands for the purposes of this title. If mineral lands are afterwards claimed to exist at other locations than are so designated, they shall also be examined and classified accordingly.

"Article 3498c. It shall be the duty of the Commissioner of the General Land Office to unite a suitable number of these mineral locations into mining districts, in each of which shall be a surveyor who must either be the surveyor of the district or county or a regularly appointed deputy and an officer qualified to administer oaths.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Article 3498n. Whenever any application shall be made to buy or obtain title to any lands embraced in article 3498a, except where the application is made under this title, the applicant shall make oath that there is not, to the best of his knowledge and belief, any of the minerals embraced in this title thereon, and when the Commissioner has any doubt in relation to the matter, he shall forbear action until he is satisfied. Any such sale or disposition of the said lands shall be understood to be with the reservation of the minerals thereon to be subject to location as herein provided."

The free school, university, and asylum lands embraced in article 4218b were distributed over a large area, in fact in almost every section of the State, and the law required the Commissioner to classify all of them as agricultural, pasture, or timbered lands. No class as mineral lands is recognized by the law, but such as had been classified as agricultural, pasture, or timbered lands that should be found to be "apparently mineral bearing" were required to be designated as "mineral lands."

The State adopted the policy of selling these lands as rapidly as possible to actual settlers only, thereby securing a population of home owners, and, at the same time, providing a present support for the various institutions to which the lands had been devoted. To accomplish the purpose of rapid sale, large powers were conferred upon the Commissioner of the General Land Office, authorizing him to make all necessary rules and prescribe forms of procedure in sales. He was empowered to appoint three appraisers in each county to examine, classify, and appraise each tract, and when satisfied with the classification and valuation, he should offer the land for sale according to its classification. The action of the Commissioner is not subject to revision, and when, in the exercise of his extensive powers, he offered the land for sale classified as agricultural land, and William Armstrong purchased it, complying with the law, the Commissioner's acts were conclusive upon the State. Steel v. Smelting Co., 106 U. S., 450.

Respondent claims that articles 3498a and 3498n reserve from sale all lands containing valuable minerals, whether known or not. The

language, "All public school, university, and asylum lands  *  *  * containing valuable mineral deposits are hereby reserved," etc., was not intended to operate upon lands which had not been found to contain valuable mineral deposits and were not apparently mineral lands. Davis v. Wiebbold, 139 U. S., 516. The State provided for the classification so as to designate the lands reserved and offered all for sale through the same officers, and it can not be said that there was an intention to have a secret reservation of that which was not known. We are not called upon to decide what would be the effect of prior actual knowledge by the purchaser of the existence of minerals in the land.

In the case last cited, language very similar to that used in our statute was held to reserve only such lands as were known to contain minerals, and a sale having been made and the land patented before it was known that there were mineral deposits therein, the purchaser took the land and all minerals contained in it. Under our decisions, a sale by the State and compliance by the purchaser gives a vested right in the land.

In support of his contention, respondent claims that under article 3498n, Armstrong was required to file with his application to purchase an affidavit to the effect "that there is not, to the best of his knowledge and belief," any of the minerals embraced in this title thereon," and he having failed to file it, the Commissioner had no authority to award the land to him. The language, "Whenever any application shall be made to buy or obtain title to any of the lands embraced in article 3498a," refers only to such lands as are reserved by that article, which is expressed to be "all public school, university, and asylum lands containing valuable mineral deposits." Lands which do not contain minerals are not embraced in that article; hence the oath prescribed by that article does not apply to lands classed as agricultural and not known to be mineral lands. This provision furnishes a strong support for the construction that we have placed upon article 3498a, because it implies that reserved land may be sold under the general provisions of the law, for there is no other law under which it could be bought except the title regulating the sale of mineral lands. For example, if land classed as agricultural, pasture, or timbered has been marked by the geological and mineralogical survey as mineral and an actual settler believes it is not so in fact, he can file his application under the general law, and, in addition, take the oath prescribed by article 3498n, and thus make an issue as to whether the land is within the meaning of the law, which the Commissioner of the General Land Office is empowered to decide, and may sell it as nonmineral-bearing land. It is, however, provided that in such case the person who may purchase land that has been once reserved can only acquire the title subject to the reservation of all minerals which may be contained in it. The reservation is confined to such land as may be sold by the Commissioner upon investigation, and by no possible construction can it be applied to all of the public school, university, and asylum lands.

If there were a doubt, the specific terms by which the reservation is applied to mineral lands would exclude its application to other lands not named.

"Under the general rule of statutory construction, laws relating to the same subject enacted during the same session, are to be construed together and are ordinarily to be taken as parts of the same act." Austin v. Railway, 45 Texas, 266. It would be difficult to find a case to which the rule would apply with greater force than to this. The subject of legislation is so essentially the same in both acts that it required classification to separate them. The construction which we have placed upon the two statutes, considered as parts of one, gives full effect to the provisions of both and sustains the acts of officers performed in the execution of them.

Our interpretation of the statutes under discussion is supported by the contemporaneous construction placed upon them by the officers charged with the execution of both laws, also by the construction the Legislature placed upon those laws when at various times it has re-enacted them with the construction of the executive department of the government. Black on Interp. of Laws, 220; Railway v. State, 81 Texas, 602.

The provision of the law regulating the sale of agricultural, pasture, and timbered lands, which prescribes the terms upon which the purchase may be made and the affidavit necessary to accompany the application, and the law regulating the sale of such lands as contained deposits of valuable minerals have each been continuously in force, during and since the year 1889. Four different men as commissioners of the general land office, four governors, and four attorneys-general have construed those laws to mean that when the sale is made under the application for agricultural lands which have been classified as such, it carries a good title to the purchaser, and, upon compliance with the general provisions, such purchaser is entitled to a patent granting the land without reservation.

When the Twenty-first Legislature enacted the law by which the mineral lands were reserved, the law of 1887, prescribing the terms for the sale of agricultural and pasture lands, was in force and was practically the same as the Act of 1895. If it had been intended by the Legislature in enacting the law for the sale of mineral lands to change the terms on which the agricultural and pasture lands might be purchased, that body would have so expressed it. In 1895, after the two laws had been in force for six years and had been construed by the Commissioner and other executive officers in the sale of millions of acres, the Legislature re-enacted both laws substantially in the terms of the laws which had been construed and executed by the executive department, thereby adopting the construction that the officers placed upon the language used. If the Legislature did not intend to adopt the language as it had been construed and enforced, it would have changed the phraseology so as to express the intended meaning. At each session of the Legislature since the passage of the

law of 1889, regulating the sale of mineral lands, the general law relating to the sale of the public school lands has been amended without making any change in the language which prescribes the affidavit to be made by the purchaser of agricultural lands, or the terms upon which the patent may be procured. This would seem to be sufficient to establish the legislative construction of those laws, but the last Legislature emphasized its understanding of them to be in conformity with the previous construction by enacting a law providing for a mineral survey of all of the public school, university, and asylum lands, dated March 28, 1901, in which it was declared: "Whereas, there is now no provision for a mineral survey of the public lands of the State, and as a result the mineral value of such lands is not known and State lands are being sold without regard to their mineral value, whereby great loss is resulting to the public free school, asylum, and university funds of the State." The Legislature then understood that the lands were being sold without any reservation of mineral rights therein and did not attempt to enforce such reservation except by providing for the designation of the lands to be reserved. On the 19th day of April, 1901, the same Legislature enacted another law regulating the sale of "public free school and asylum lands," and in doing so, prescribed the same affidavit in case of the purchase of agricultural land that had been required since 1887. These facts can leave no doubt that the construction of the law under which Armstrong purchased the land in question has been maintained by the Commissioner of the Land Office, the Governor and Attorney-General, and indorsed by the Legislature down to the present time.

The interpretation contended for by the respondent would render void all grants of the public school, university, and asylum lands which have been made since 1889, and under the most favorable view, would convert those grants from fee simple, absolute titles into titles subject to the claim of the State for all minerals that might be found in them. The inclosures of those men who have settled upon the land would be liable to the intrusion of prospectors and speculators, with the right to dig ditches, sink shafts, and bore wells for the purpose of ascertaining whether or not minerals are contained therein. No provisions are made for protecting the rights of the State's vendees, nor rules regulating the operations of the seeker after minerals, but the unqualified right is given to explore the lands without regard to the rights of others, which shows that it was not intended to apply to lands which the State had sold. It is inconceivable that the Legislature intended that such results should flow from the policy that it adopted, which at all times has been most liberal for the protection of the actual settler upon the public domain.

Upon the admitted facts, the relator is entitled to receive a patent for the land in question, and it is ordered that a writ of mandamus issue, directed to Charles Rogan, Commissioner of the General Land Office, commanding him to receive the treasurer's receipt and the

patent fee, and that he prepare and sign a patent to relator for the land described and present it to his excellency J. D. Sayers, Governor of Texas, for his signature.   It is ordered that respondent pay all costs.

*Mandamus granted.*