COLQUITT-TIGNER MINING COMPANY, LIMITED, v. CHAS. ROGAN, COMMISSIONER OF THE GENERAL LAND OFFICE.

No. 1103. Decided May 12, 1902.

**1.—Suit Against Land Commissioner—Intervention—Adverse Claimant.**

In a suit against the Commissioner of the General Land Office to enforce rights claimed by plaintiff to acquire public land, one claiming the land by location subsequent to plaintiff's is not entitled to intervene. Commissioner v. Smith, 5 Texas, 471, and Chappell v. Rogan, 94 Texas, 492, distinguished, as being cases where the Commissioner denied plaintiff's claim because of the superior rights of a prior locator. (Pp. 453, 454.)

**2.—Mining Law—Purchase of School Land—Geological Survey.**

Land made known to Commissioner of the General Land Office as mineral bearing, by the filing of a mining claim in compliance with sections 4-7 of the Act of 1895 (Laws, 1895, page 197; Batts' Revised Statutes, articles 3498d, e, f, and g), may be purchased from the State under such act and by compliance with its terms, by such locator or his assignee, though never classified as mineral lands by the geological and mineralogical survey. (Pp. 454-461.)

**3.—Same—Power of Land Commissioner to Classify.**

See opinion as to the power of the Commissioner of the General Land Office to determine whether lands were mineral bearing, and if found to be so, to sell as such under the mining law of 1895, independently of their classification as such by geological and mineralogical survey or of information as to their character derived from the filing of a mining claim. (Pp. 455-461.)

**4.—Mineral Land—Classification—Statutes Construed.**

The reservation from sale under the general law of lands "specially included under the operation of the act," contained in section 1 of the mining law of 1895 (Batts' Revised Statutes, article 3498a), is not limited to lands designated as mineral bearing by the geological and mineralogical survey under section 2 of such act; the language of the law being uncertain in meaning, the injurious effect of a contrary construction upon the interests of the State as well as of owners of mining claims located under the previous law, the time required for such survey, the failure of the same Legislature to make appropriation for its continuance, the fact that other methods provided by the law would give the information, and the absolute right given to actual settlers to purchase lands not so reserved, with their minerals, as agricultural, grazing, or pasture lands, could all be considered in reaching the construction permitting the Land Commissioner other methods of ascertaining the lands reserved. (Pp. 455-461.)

Original application for writ of mandamus to the Commissioner of the General Land Office.

*Newton & Ward, Millard Patterson,* and *C. N. Buckler,* for relator.

*C. K. Bell,* Attorney-General, and *T. S. Reese,* Assistant, for respondent.

WILLIAMS, ASSOCIATE JUSTICE.—This is an original application by relator for a mandamus to compel the respondent to receive and file, in the General Land Office, its application for a patent to a mining claim upon a section of school land in Brewster County, the receipt of the State Treasurer for the price due the State for the purchase of such claim, and certain deeds thereto, from the original locator thereof, to the relator, and to accept the fee of $5 for the patent.

The respondent declines to receive the papers and the fee, because he is in doubt as to relator's right to acquire a mining claim upon the section in question, for the reason that it has never been examined and designated as apparently mineral bearing land, as provided by article 3498b, Revised Statutes, by geological and mineralogical survey. It is conceded by the respondent that the relator and those to whose rights it has succeeded have done everything required by the statute to invest it, with the right it claims, unless it is true that the land, not having been designated as mineral bearing by the survey, was not open for such claim; and this is the sole question raised in the case between the relator and respondent.

R. A. Dewees, before the hearing, filed an application for leave to intervene, asserting a claim to the land adverse to but subsequent in its origin to that of relator, and contending that, as such adverse claimant, he was a necessary party to the proceedings, under the rule laid down in Commissioner v. Smith, 5 Texas, 471; Chappell v. Rogan, 94 Texas, 492, and other cases. Dewees' attitude towards this controversy is very different from those occupied by the persons held to be necessary parties, in the cases cited, in relation to the issues therein. In each of those cases, the person held to be a necessary party was setting up a claim to the land prior to that asserted by the party seeking the mandamus, and the existence of such prior claim constituted the reason for the refusal of the officer to recognize and act upon that of the relator. It was, therefore, necessary to determine the questions of fact and law upon which the elder claim depended before the duty of the officer could be determined; and the reason of the decisions was, that it would be fruitless to proceed against the officer, alone, when the real controversy was between the plaintiff and a third person, and would be left open by any judgment that might be rendered, unless both were parties. Here, the claim of Dewees originated long after that of the relator acquired a legal standing, if such it ever acquired, and the objection urged by the officer to the doing of the things which relator seeks to have him do is not at all dependent upon the existence of the subsequent claim, but would have equal force, if that claim had never been made. In order for plaintiff to perfect its right, if it has any, into a patent, it is necessary for it, as a

preliminary, to pay the fee and file the papers mentioned in the petition. The officer objects to receiving them, not because some one else has a better right to the land, but because relator can not acquire it, as attempted. This presents an issue of law, between the relator and the respondent, with which the third claim has nothing to do, and it may be decided, as between the parties to the proceeding, without passing on that claim. The judgment, if for relator, will determine, not the right of Dewees to acquire the land, but only that it is the Commissioner's duty to receive the patent fee and the papers tendered by relator. The statute, itself, under which relator must obtain his patent, if at all, provides for the assertion of the rights of other persons in a different way. Rev. Stats., arts. 3498i, 3498k.

The petition for intervention is therefore dismissed without prejudice to the applicant's rights.

The claim upon which the relator relies was initiated in 1897, and depends upon the provisions of the Act of 1895, "To better and more fully promote the development of the mining resources of Texas and to repeal all laws in conflict with the provisions of this act." Rev. Stats., arts. 3498a to 3498t. To fully grasp the scope and the meaning of the provisions of that act, it is proper to consider not only some of the older statutes regulating the disposition of school and other lands for mining purposes, but also previous and contemporaneous legislation concerning the disposition of such lands for other purposes.

Under the legislation of 1883, the land board was clothed with power and charged with the duty of selling these lands, generally, and at the same time of disposing of the minerals in them; which involved the duty of ascertaining, as far as practicable, what portions of lands to be sold contained minerals. In 1887 an act was passed devising a general scheme for the disposition of the school, university, and asylum lands, and sales were required, with a few exceptions, to be made to actual settlers only; and no provision was made for the sale or other disposition of minerals or mineral lands as such. The land board was abolished, and the duty of making the sales provided for was devolved upon the Commissioner of the General Land Office. That officer was required to sell the lands to actual settlers who complied with the provisions of the statute, and this left the State without any express provision for the reservation or protection of mineral lands or of the minerals in them. In 1889, an amendment of this statute of 1887 was adopted, which did not, in itself, alter this feature; but at the same session another statute was passed regulating the disposition of minerals and mineral lands, most of the provisions of which were the same as those of the subsequent law of 1895, the pertinent provisions of which will be presently stated. These laws of 1887 and 1889 continued to regulate, concurrently, the disposition of the lands as mineral or otherwise until 1895, when two new statutes were adopted at the same session of the Legislature, one regulating, in much the same way as that of 1887 and its amendment of 1889, sales of the lands, generally, to actual settlers, and

the other treating of the disposition of such of those lands as contained valuable minerals. In all of these laws, from 1887 to 1895, the officer whose duty it was to administer them in making sales, whether of one kind or the other, was the Commissioner of the General Land Office; and this is a feature which has an important influence upon the question before us.

While the land board was intrusted with the making of sales, it was empowered to protect interests of the State in the minerals in the lands placed under its control. When that board was abolished, there was an interval from 1887 to 1889 when there was no officer expressly charged with such duty; but this omission was, in some measure, supplied by the legislation of 1889, putting the power in the Commissioner of the General Land Office, subject to the provisions of the act of that date. Since that time, there have been in existence two laws, one of which made it the duty of the Commissioner to sell the lands to actual settlers and others with no exception or reservations of minerals or mineral lands, and the other reserving from such sales those lands which the statute described as mineral lands. It is obvious that the last mentioned law so modified that first mentioned as to take out of its operation whatever lands were intended by the Legislature to be included in the reservation and to make it the duty of the Commissioner, in selling to actual settlers, to withhold from such sales the lands embraced in the exception. This necessarily involved the power and duty on his part of ascertaining whether the land to be sold belonged to one class or the other and of determining which law controlled the disposition of it, unless that power and duty were placed elsewhere. The construction of these statutes advanced in behalf of respondent is that this function, under the mining laws of both 1889 and 1895, belonged exclusively to those intrusted with making a geological and mineralogical survey, and that only the lands designated by them can be treated as mineral lands to be disposed of under those laws; and that all lands not thus designated must be held for sale, under other laws, to actual settlers only, and are not open to exploration for the location of mining claims. The Act of 1895 controls this case, and it is important to further notice that of 1889 only in order to see the persuasive effect of the additions made to its provisions in that of 1895. The first section of the Act of 1889 is as follows:

"Section 1. All the public school, university, asylum, and public lands containing valuable mineral deposits are hereby reserved from sale or other disposition, except as herein provided, and declared free and open to exploration and purchase under regulations prescribed by law by citizens of the United States and those who have declared their intention of becoming such."

The corresponding section of the Act of 1895 is as follows:

"Section 1. That all public school, university, asylum, and public lands specially included under the operation of this act, all the lands now owned by the State, situated within the reservation known as the

'Pacific Reservation,' which were taken off the market and reserved from sale by an act approved January 22, 1883, containing valuable mineral deposits, are hereby reserved from sale or other disposition, except as herein provided, and are declared free and open to exploration and purchase under regulations prescribed by law, by citizens of the United States and those who have declared their intention of becoming such: provided, that all who have located and recorded valid claims under previous valid laws and have not abandoned same, but are engaged in developing same, shall have a prior preference right for ninety days after the passage of this act in which to relocate same under this act."

The second and third sections of the two acts are the same so far as they affect the question before us, and only those of 1895 need be given:

"Section 2. It shall be the duty of the Commissioner of the General Land Office immediately upon the passage of this act to have a map made showing the location of all public school, university, asylum, and public lands which are unsold at that date, and it shall be the duty of the geological and mineralogical survey to examine all such lands as soon as practicable thereafter, and to designate such tracts as are apparently mineral bearing as mineral lands for the purpose of this act. If mineral lands are afterwards claimed to exist at other locations than are so designated, they shall also be examined and classified accordingly.

"Section 3. It shall be the duty of the Commissioner of the General Land Office to unite a suitable number of these mineral locations into mineral districts, in each of which shall be a surveyor, who must either be the surveyor of the district or county or a regular appointed deputy and an officer qualified to administer oaths."

It is upon these provisions that respondent's contention is chiefly based. It is, that the reservation is of those mineral lands only which have been designated as such in the manner provided for in the second section; and that this is made clear by the addition, in the Act of 1895, of the words "specially included under the operation of this act," which, it is contended, can refer to no other lands than those afterwards required to be so designated; and by the use, in the second section of both statutes, of the words "to designate such tracts as are apparently mineral bearing as mineral lands for the purposes of this act." It is admitted that the law, thus construed, would operate most injuriously to the State, because, under this construction, all lands which have not been so designated have been and are yet left open to purchase under the law regulating sales of agricultural, grazing, and timbered lands at the comparatively small prices fixed under that law for such lands, with a consequent loss to the several funds to which the lands belong of all minerals in them, even though the presence of valuable minerals were known to all; and to private individuals, because it at once destroys all mining claims located and filed in the Land Office and there recognized for years, where they are located on lands designated by the required survey.

It must have been known to the Legislature that such a survey would

require years of exploration and examination before all of the school, university, asylum, and public lands could be passed upon. It was a demonstrated fact, in 1895, that, in the years during which the survey had been in progress, comparatively a very small portion of the lands had been ·examined. When each of these mining laws was passed, it must have been known that some of the lands in certain regions, contained the minerals which it was the purpose to preserve. The pressing necessity for further legislation arose out of the fact that a statute was in force absolutely requiring sales to actual settlers of any of these lands, as agricultural, grazing, or timbered, and that without some further power the Commissioner could not refuse to make such sales. Is it reasonable to impute to the Legislature the purpose in passing the law, the very object of which was to reserve and protect from such sales lands containing minerals, and in providing for a survey as an instrument for the better ascertainment of the location of minerals, to so far defeat its main purpose as to allow lands known to contain minerals to remain, until examined by the survey, subject absolutely to purchase under the existing law, with no power anywhere to preserve them? Is it reasonable to say that, if the Legislature proposed only to reserve mineral lands from sale after they had been ascertained to be such by the prescribed survey, that at the same session which adopted the mining law of 1895, it would have refused, as it did, to make an appropriation for the continuation of that survey? The effect of the construction contended for is that, by the elaborate efforts of the Legislature, in 1889 and 1895, to save from sacrifice and to develop the minerals in these lands, the only result achieved was the protection of the small part of them which was designated before the discontinuance of the survey; and that since such discontinuance, no protection has been or is possible, whatever may have been or may be the knowledge of the Commissioner as to the existence and location of minerals.

That such consequences could have been foreseen and intended in the adoption of laws "to better and more fully promote the development of the mineral resources of Texas" is hardly credible.

Results such as we have mentioned would furnish no reason to justify a court in refusing to declare the law, as it is written; but they may very well raise a doubt as to the correctness of a mere construction of the statutes which would lead to them; and the proposition contended for is only a construction not written in the language of the statutes. The intent and the meaning of the statute must be gathered from the language in its provisions; but when the meaning of that language is uncertain, nothing affords a better guide to its interpretation and construction than the general scope and purpose of the law. We have seen what they were; and when we approach the construction of particular provisions with the light which they afford, most of the difficulty vanishes.

What were the lands reserved from sale by the first section of the act and how and by whom are they to be ascertained? Besides the

"Pacific Reservation," they were, "all school, university, asylum, and public lands specially included under the operation of this act, containing valuable mineral deposits." What lands containing valuable mineral deposits were thus "specially included?" There is nothing in the first section to indicate that the lands which should afterwards be designated by survey were the only ones on which the law was to operate, nor is there, in the second section, providing for the survey, anything to show that the lands so surveyed were the ones referred to as specially included under the operation of the statute. The provision, in the latter section, for the designation, "as mineral lands for the purposes of this act," was doubtless intended to bring lands so designated within the category of lands "containing valuable mineral deposits," and to require them to be treated and sold as such; but it is far from being an express provision that they are the only lands specially included under the operation of the act. It requires a consideration of the whole statute to determine what lands are so included. In a very broad sense, the act operates upon all of the lands named in the first section; but it is not permissible to hold that a present reservation was made of all lands which, in fact, contained minerals, from sale under the other statute. Schendell v. Rogan, 94 Texas, 585. In that case it was held that the Commissioner had the power, under the other law, to sell lands to actual settlers where, at the time of sale, the existence of minerals in them was unknown to him and to the purchaser, and that such sales were unaffected by the provisions of the mining law. That decision does not determine the status of lands still unsold when it becomes known that they contain minerals, nor the question as to the manner in which, or means by which, the fact that the lands are mineral bearing is to be evidenced, in order to bring them within the operation of the mining law. That the fact must be ascertained or become known, in some way, before the Commissioner is authorized to refuse to sell to actual settlers, is a fair deduction from the decision.

The fact that, in the Act of 1895, the words "specially included under the operation of this act" were added to the language of the Act of 1889, evidences the purpose of the Legislature to prescribe some sort of limitation to the reservation of lands from general sales; but we are still left to the other sections of the law to determine what the limitation is, since it can only be defined by seeing, from all of the provisions, what lands they operate upon in the sense of the first section. The explanation, suggested by relator with much force, is that this language in the first section was intended merely to restrict the more general provision of the Act of 1889, which applied to lands containing valuable minerals of all kinds, so that it should apply only to lands containing the minerals specifically mentioned in the other sections. It is unnecessary that we should definitely decide whether the statute applies to lands containing valuable minerals of all kinds, or to such only as contain formations of certain characters, or minerals of certain species. That question may become one of great importance, and this case does not necessarily in-

volve it.   The interpretation of the first section suggested by the
Attorney-General is that it intends that the lands which it reserves shall
be identified by those other provisions which provide for the ascertain-
ment of lands which are mineral bearing.   This may be assumed to be
true for the purposes of this case, and yet it does not follow that the
only way in which the fact of the existence of minerals in particular
lands can be ascertained, under the law, is by the survey.   Since the Com-
missioner has to make sale under two laws, he must determine, in some
way, the character of land to be sold, as mineral or not, in order that
he may know which law is to govern his action.   One way is from the
result of the survey.   But that furnishes him with no information, in
most cases; and if he can treat as mineral lands any not thus passed
upon, he must act on information otherwise obtained.   If the statute
does not make the result of the survey the exclusive test, but provides
other methods by which the essential fact can be learned, the whole
theory of the defense falls.   That the statute does not, in express terms,
make the survey the only evidence, we have already shown.   That it
provides for the discovery of minerals in other ways, is equally clear.
The fourth section regulates the location of claims for named metallic
minerals.   It requires the locator, among other things, to sink a shaft,
or·tunnel, of a prescribed character, and to make affidavit that he has
done this work, and that he has discovered valuable minerals on the
land which he seeks to appropriate; and the affidavit is to be recorded
by the surveyor.   The claim is to be then surveyed and the field notes
returned to the General Land Office.

By the tenth section, provision is made for the purchase of, "any
lands of the State which are specified, or included, in section 1 of this
act," containing the nonmetallic minerals mentioned.   It gives the right
to purchase one,—under some circumstances, two sections; but requires
the person seeking to buy to file with the surveyor his affidavit that he
has gone upon the land, in good faith, with the intention of purchasing
the same under that section of the law.   This affidavit is to be filed in the
General Land Office and the Commissioner is required "to take the
section off the market" for twelve months, which time is allowed the
purchaser to prospect the land before making payment.   This section
provides further:   "All said lands are reserved from sale or other dis-
position than under this act."

In these provisions there are several noticeable features affecting the
question under discussion.   (1)   They both provide methods for bring-
ing to the Commissioner information that the land thus sought to be
taken up contains minerals.   (2)   Nowhere in them is there an inti-
mation that such land must have been previously designated by the
survey.   (3)   Section 10 evidently assumes that the land may not have
been so designated; for it expressly provides for the reservation from
other sales, upon the doing of the things required, whereas, if the land
had been determined by survey to be mineral bearing, it would have

been already thereby reserved; and that section requires that the land be taken off the market, implying that it was previously on the market, when, if a designation had been made it would have been by that fact alone taken off the market and reserved from sale, except as mineral land. (4) Section 10, in defining the land which might be thus acquired, refers to it as any land of the State "specified or included in section 1;" while if the purpose had been to include only lands passed on by the survey the reference would naturally have been to section 2, which provides for the survey. This feature is found also in section 14. Indeed, the statute, if the design was to express the idea suggested by the defense, is most inaptly constructed and worded throughout. It would be remarkable, if the Legislature intended to protect from general sale only the land which, in the course of time, the geological and mineralogical survey should ascertain to be apparently mineral bearing, that it did not simply so provide in the first section making the reservation; and yet more remarkable that, when in subsequent sections it became proper to speak of the lands subject to their operation, reference was not made to the second, instead of the first section, to identify them. The truth is, this statute was largely fashioned after the mining laws of the United States, the indefinite character of the reservation of minerals and mineral lands in which has given rise to much discussion in the Supreme Court, and the Legislature found it difficult to so define mineral lands as to effectually and certainly protect all of them, without, at the same time, imposing too severe a restriction upon sales to actual settlers and embarrassing to a great extent titles to land acquired by them. It was impracticable to reserve all lands which might, in fact, contain undiscovered minerals, since such a reservation would have gone far to defeat the operation of the other law. The Legislature, therefore, left the subject largely with the officer required to administer the law in making both kinds of sales, defining the lands reserved only by the general description employed in the first section. It provided for the survey as an aid in finding the lands to which the reservation should attach, but used no language implying that only those lands were to be protected or that the survey was to be the only means of discovery. It provided other procedure through which the Commissioner, who alone could make sales, might learn as well as, or even better than, by the survey, that particular lands contained valuable minerals. We do not see how it can be held that lands thus shown to be mineral bearing by evidence provided for by the act itself are not as truly "included under the operation" of the act, as those so characterized by the other kind of evidence—the survey. Nor do we, at present, see anything in the act, which prevents the broad language of the reservation from operating upon any of the lands named in the first section whenever it becomes known to the Commissioner that they contain valuable minerals of the kind mentioned in the act. So broad a declaration of the law is not, however, essential to a decision of this case, and we content ourselves with holding that the

evidence furnished by the relator, being such as is provided for in the statute, is sufficient to show that the land is included under the operation of the mining law and that the disposition of it is controlled thereby. Respondent makes no question as to the land being, in fact, mineral bearing.

Much stress was laid in argument upon section 3, providing for the uniting of "these mineral locations" into mining districts with a surveyor for each, who is to do the surveying of mining claims, but we see nothing in it inconsistent with either view of the principal question. If it be conceded that the locations referred to in that section are only the lands designated by the geological and mineralogical survey, there is nothing to require that the mining claims provided for in the fourth and tenth sections shall be made exclusively in such districts. The claims located under these sections are to be surveyed by the county or district surveyor, but this does not necessarily mean that they can only be made by a county or district surveyor who is within one of the mining districts. On the contrary, section 20 strengthens our construction by empowering all county or district surveyors to take affidavits which are required by the statute "for the purpose of effectually carrying out the provisions of the act."

The decisions of the Supreme Court of the United States construing the national mining law are consistent with the construction which we make of our statute and tend rather to sustain it than otherwise. Barden v. Railway, 154 U. S., 288, and cases there referred to.

It is perhaps proper that we say that what we have spoken of as the respondent's contention is presented for him by the Attorney-General merely as a view of the statutes which has created a doubt in his mind as to his powers and duties in the premises, and made it proper that he have an authoritative decision before acting. While we are clearly of the opinion that the law is with the relator, the conclusion requires the construction of a mass of statutory provisions, ill-adjusted in relation to each other, quite indefinite in their language, and well calculated to create doubts.

*Mandamus granted.*