## C. D. GREENE v. J. T. ROBISON, COMMISSIONER OF GENERAL LAND OFFICE.

### No. 2868.   Decided March 12, 1919.

**1.—Public Land—Sale—Mineral Rights—Classification.**

A purchaser of school land classified and sold as agricultural land under the Act of April 12, 1883 (Laws, 18th Leg., ch. 88, p. 85), acquired title in fee, including the right to all minerals therein, where such land was not known, at the time of the sale, to contain valuable minerals, though by section 14, of such Act, the State reserved to itself the minerals on all lands sold under it. (Pp. 370-383.)

**2.—Same—Permit to Prospect.**

A purchaser of school land under the Act of April 12, 1883, having thereby acquired the right to the minerals therein, the State could not grant to another a permit to prospect on it for minerals under the Act of 1913 (Acts 33d Leg., ch. 173; Acts of 33d Leg., Extra Session, ch. 18). (Pp. 375, 379.)

**3.—Same—Cases Followed.**

The decisions of the courts of the United States in regard to unknown minerals in land sold under Acts of Congress (Deffeback v. Hawke, 115 U. S., 392; Davis v. Weibbold, 139 U. S., 507; Dower & Richards, 151 U. S., 658; Shaw v. Kellog, 170 U. S., 312; Burke v. Southern Pac. Ry. Co., 234 U. S., 669), and of the courts of this State on the same question under its statutes (Schendall v. Rogan, 94 Texas, 585), are approved and followed. (P. 372, 376).

**4.—Public Land—Sale—Reservation of Minerals—Statutory Construction.**

In construing the Act of April 12, 1883, for sale of school land and determining the effect of the reservation from sale, by section 14 of that Act, of minerals contained in such land, it is proper to consider the Mining Law enacted by the same body (Act of April 14, 1883, Laws, 18th Leg., p. 85), placing the control of mining rights in the hands of the land board with the duty and power to ascertain what public lands contained valuable minerals and should be dealt with as such. (Pp. 378, 379.)

**5.—Statutory Construction—Practical Effects.**

That public land not known to contain valuable minerals, purchased on the faith of a conveyance in fee by the State, after classification by it as agricultural and not mineral-bearing, if subject to exploitation by others for the development of mining, might, at any future time, be rendered useless to the purchaser for agriculture and this without provision for compensating him, is considered in determining whether or not such land should be included in those in which, by statute, the mineral rights were reserved to the State. (Pp. 379, 380.)

**6.—Statutes—Revision—Effect.**

The re-enactment of the Validating Act of 1879, releasing mineral rights to previous purchasers of land, by its inclusion as article 4041, in the Revised

Statutes, gave it operation as a new statute from that date, validating such mineral rights in purchasers up to the time of adoption of the Revised Statutes.   (Pp. 381, 382.)

7.—Same.

The general rule that the re-enactment of a former statute by including it in a revision of the statutes, adopts it only with the same effect the statute originally had, is one of construction only, and is not conclusive.   (P. 381.)

8.—Validating Act—Constitutional Law.

Article 4041, Rev. Stats. of 1895, being merely a validating act, was not unconstitutional as granting relief to purchasers of school lands (Const., art. 7, sec. 4) nor as an appropriation of public land to other than school purposes (Const., art. 7, sec. 5).   (P. 382.)

Original application to the Supreme Court by C. D. Greene, for writ of mandamus against J. T. Robison as Commissioner of the General Land Office, with whom, as co-respondent, was joined Peter Servatius, who claimed the mineral rights in the land under the previous sale. The Commissioner, though refusing in deference to the opinion of the Attorney General, to issue the permit sought to be required by the mandamus, being of opinion that relator was entitled thereto, presented his views to that effect, while the Attorney General resisted the application for mandamus.

*Carrigan, Montgomery & Britian,* for relator.   (*F. M. Etheridge* on behalf of parties interested in the question but not in the case was permitted to file an argument in support of the same views as friend of the court.)

Article 14, section 7, of the Constitution, releasing to the owner of the soil all mines and minerals, was curative in its nature and retrospective in its effect.   Fox v. Robinson, 100 Texas, 426.   It was not intended to prevent the State from reserving mines and minerals in the public domain subsequently granted by it.   This holding is conclusive upon the proposition that the State had the right to sell its school lands, reserving the mineral rights, as was done under the two Acts of 1893.

There can be no doubt that the effect of these acts was to reserve to the State the mines and minerals under this land which was sold to Douglass.   The only question is, whether or not the State has, by any subsequent legislation, parted with the title to such mines and minerals. Article 4041 of the Revised Statutes of 1895 is but a copy of the provisions of the Constitution, and is also a copy of article 3080 of the Revised Statutes of 1879, which was carried forward by the compilers of the statutes of 1895 as article 4041.

If the Legislature intended, by the adoption of the Revised Statutes of 1895, to part with the title to the minerals which belong to the public free school fund, and which had been reserved in prior sales of public free school land, such an enactment would be in violation of article 7, section 4, of the Constitution, depriving the Legislature of power to grant any relief to purchasers of public free school land.   It is well

settled in this State that mineral rights in land are real estate and that they may be conveyed separate and apart from the surface. Texas Co. v. Daugherty, 107 Texas, 226. The evident purpose of this article of the Constitution was to make the State a trustee for the school fund, and to deprive the Legislature of any power to do anything except to sell such land and to forbid the Legislature from giving any relief to purchasers. These lands having been sold under the Act of 1883 with a reservation of the mineral rights, the Legislature was afterwards without power to donate to the purchasers these valuable mineral rights.

However, we think that it was not the purpose of the Legislature, and that it has never attempted to release to the purchasers of the school land the mineral rights reserved by the State. We have called attention to the fact that article 4041 of the Revised Statutes of 1895 is a literal copy of article 3800 of the Revised Statutes of 1879. If section 19 of the final title to the Revised Statutes of 1895 is to be given any effect, it must be held that article 4041 of the Revised Statutes of 1895 was not a new enactment but was simply a continuation of the law as the same appeared in the Revised Statutes of 1879. Commissioners for revision are not authorized to make changes in the substance of the statute laws of the State, but simply to arrange them in convenient form. Hartford Fire Ins. Co. v. Walker, 94 Texas, 473. As was said in Judd v. State, 35 Texas Civil Appeals, 418: "The Revised Statutes are not a re-enactment of the laws, but merely a continuation thereof, which, in our opinion, requires a construction of the Act as originally enacted. We also in this connection call the court's attention to the cases of McKenzie v. Baker, 88 Texas, 669; Marston v. Yaites, 66 S. W., 867; Corbett v. Sweeney, 151 S. W., 858, and Braun v. State, 40 Texas Crim., 236, all holding that the carrying forward of a provision contained in a former statute was not a re-enactment, but merely a continuation thereof. The remarks of the court in Cox v. Robison, to a contrary effect, were clearly dicta, and not necessary to the opinion of the case.

*J. T. Robison,* Commissioner of the General Land Office, respondent herein, being of opinion that relator was entitled to the permits sought, but having refused same in deference to the opinion and advice of the Attorney General, presented in writing, by permission of the court, his personal views of the question, citing, as to the construction and effect of article 4041; Adams v. Railway Co., 70 Texas, 252; Fischer v. Simon, 95 Texas, 234.

*F. M. Etheridge,* by permission of the court, cited to the same effect Insurance Co. v. Walker, 94 Texas, 473; Fischer v. Simon, 95 Texas, 234; Railway Co. v. Hill and Morris, 97 Texas, 506.

*B. F. Looney,* Attorney General, and *G. B. Smedley,* Assistant, for respondents.—The minerals were not reserved when the land was sold.

Colquitt-Tinger Mining Co. v. Rogan, 95 Texas, 452; Schendell v. Rogan, 94 Texas, 585.

The minerals in the land were released by article 4041, Revised Statutes of 1895. Cox v. Robison, 105 Texas, 426; Heil v. Martin, 70 S. W., 430.

Though, as a general rule, a former statute copied into a revision is to be construed as a continuation of the existing statute, and not as a new law, the rule is one of construction merely. St. Louis S. W. Ry. Co. v. Hill and Morris, 97 Texas, 506; State v. Burgess, 101 Texas, 525; Wilson v. Vick, 93 Texas, 88.

Article 4041, Revised Statutes of 1895, is not unconstitutional. Judkins v. Robison, 160 S. W., 955; Barker v. Torrey, 69 Texas, 7; Savings Bank v. Dowlearn, 94 Texas, 383; Imperial Irrig. Co. v. Jayne, 104 Texas, 395; Texas Cent. Ry. Co. v. Bowman, 97 Texas, 421.

*W. O. Crane, C. L. Carter,* and *T. J. Lawhon,* appearing as friends of the court, filed by permission brief and argument in opposition to application of relator.

A purchaser of public school lands, under chapter 88, Acts of 1883, classified and sold as agricultural land, and not known to contain minerals at the date of the sale, acquires said land and the minerals thereof by absolute fee title, subject only to performance of the executory terms of the sale. Deffeback v. Hawke, 115 U. S., 392; Davis v. Weibbold, 139 U. S., 507; Cowells v. Lammers, 10 Sawyer, 246; Dower v. Richards, 151 U. S., 658; Richards v. Dower, 81 Cal., 44; Dower v. Richards, 73 Cal., 477; Smith v. Hill, 98 Cal., 122; McCormick v. Sutton, 97 Cal., 373; Carter v. Thompson, 65 Fed., 329; Bonner v. Keikle, 82 Fed., 697; Larned v. Jenkins, 113 Fed., 634; Board of Education v. Mansfield, 17 S. D., 72; Callahan v. James, 71 Pac., 104; Moran v. Horsky, 178 U. S., 209; Bardin v. North Pac. Ry. Co., 154 U. S., 289; Burke v. So. Pac. Ry. Co., 234 U. S., 686; Diamond Coal and Coke Co. v. United States, 233 U. S., 236; Schendell v. Rogan, 94 Texas, 585; Chappell v. Rogan, 63 S. W., 1006; Mining Co. v. Rogan, 95 Texas, 452; Cannon v. Vaughan, 12 Texas, 400; Shaw v. Kellog, 170 U. S., 332; Fristoe v. Blum, 92 Texas, 76.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

The question presented by the case is whether a purchaser, under the Act of 1883, of school land from the State, not at the time of sale known to contain minerals, but fairly and in good faith classified and sold by the State authorities, charged with the duty, as agricultural land, acquired title to the minerals which might thereafter be discovered in the land. Stated more closely, as reduced to the concrete issue of this proceeding, the question is whether the rights of such a purchaser are subject to the right of the State, through the Legislature, to authorize future exploitation of his land in an effort to discover minerals and a right of the State thereto if discovered.

The facts here are that the land involved was sold in 1885 by the State authorities under the Act of 1883 to William Armstrong. The authorities referred to were the Land Board, vested under the Act with control of the school lands of the State, with the full power to classify them and sell them to settlers. This land was classified by the board as agricultural land and sold to Armstrong as such. So far as the record shows it was not known to contain any minerals and there was no reason to believe that any were beneath the surface. At that time there had been no development of minerals in that section of the State where the land lies,—it being in Wilbarger County. There had been no such development on this land up to the time this proceeding was instituted. There was nothing in the documents relating to the sale indicating any reservation by the State of any minerals that might in the future be found in the land, or the right to assert title thereto if found.

The relator, Greene, seeks a mandamus to compel the Land Commissioner to issue him, under the Act of 1913, a permit to prospect on the land for oil and natural gas. His contention is that according to the Act of 1883 all minerals in the land, whether known or unknown, were reserved from the sale of the land to Armstrong, and that the title to them is yet in the State; and accordingly that under the Act of 1913 the State, through the Land Commissioner, has authority to grant him a permit to prospect on the land for the discovery of oil and gas, and on his offer to comply with the latter Act, should issue him such a permit.

On the law governing the relator's contention there was a conflict of views between the then Attorney General, Mr. Looney, the legal adviser of the land department, and the Commissioner, Mr. Robison, the Attorney General holding that under the circumstances of the sale to Armstrong the title to all minerals passed with the title to the land, and the Commissioner holding that they did not, which, if correct, would result in relator's being entitled to the mandamus prayed for. The Attorney General, through his able assistant, Mr. Smedley, therefore appeared in the case in opposition to the relator's suit. The Commissioner, as was his right in the view of the court, also appeared to urge his position, submitting oral and written argument strongly in their support. Because of the general interest in the case, able attorneys not connected with the immediate controversy have, with the court's permission, filed forceful arguments on both sides of the question. We have given careful attention to all of them.

Mindful of the importance of the question, as it affects both the rights of settlers who bought school lands under the Act of 1883 and the rights of the State to the minerals which may repose in them, it has had our mature consideration. Like most questions, a good deal may be said in argument on both sides of it. But the law of the case,—the right of it under and as determined by the law, is in our opinion plain.

The basis of the relator's contention is the reservation to the State of minerals in school and asylum lands as expressed in section 14 of the

Act of April 12, 1883. Gammel's Laws, vol. 9, p. 394. That reservation was in this language:

"The minerals on all lands sold or leased under this Act are reserved by the State for the use of the fund to which the land now belongs."

Reservations of minerals embodied in Acts of Congress, in terms as definite and emphatic as the reservation in this section, excepting them from sales of public lands, and just as strongly expressing that the title to them should not pass with the title to the land in its sale but should remain in the government, have repeatedly been before the Supreme Court of the United States for construction. The cases were identical in character with this one,—the mining prospector contending that the reservation was of minerals whether known or unknown; that title to them did not pass with the title to the land issued the settler, though their existence was unknown when the title to the land was conferred, and though the land was sold as other than mineral land; that it was still in the government, and the minerals therefore were subject to appropriation under mining claims whenever thereafter discovered, with the right in the prospector, of course, to fully explore the land within the area of his claim for their discovery. In all such cases that court has held, by unbroken line of decision and in opinions written by judges as eminent as ever adorned its judgment seat, that the reservation was only of minerals *known* to exist when the government's title to the land passed to the settler; that if up to that time they were not known to be in the land, they passed, if afterwards discovered, with the land, the settler's right to them relating back to the time of his acquisition of the title and that his rights to the land in virtue of his title could not be disturbed, impaired, or, as might be, in effect rendered valueless by a foreign exploitation of his land for mineral discoveries. Deffeback v. Hawke, 115 U. S., 392, 29 L. Ed., 493; Davis v. Weibbold, 139 U. S., 507, 35 L. Ed., 238; Dower v. Richards, 151 U. S., 658, 38 L. Ed., 305.

The same holding has been made by that court where the exception from the grant was "mineral land" instead of "minerals in the land." Shaw v. Kellogg, 170 U. S., 312, 42 L. Ed., 1050; Burke v. Southern Pacific Railroad Company, 234 U. S., 669, 58 L. Ed., 1527.

As stated in one of the opinions, this holding is in accord with the uniform construction of such reservations by the courts of the mineral States, both State and Federal. It is in accord with the unbroken rulings of the Department of the Interior, in the exercise of whose jurisdiction the question has frequently arisen. It was the holding of L. Q. C. Lamar when at the head of that department of the Federal government.

Attempt is made to here distinguish these decisions, but they can not be distinguished. Those which deal with the reservations of "minerals" are decisive of this case in fact. Those which relate to exceptions of "mineral land" are decisive of it in principle.

On the question as to where the title lies, there is in substance no difference between a reservation from a grant of "minerals in land," and

a reservation of "mineral land." One is just as certainly a reservation as the other, and says just as plainly that the title to the thing reserved is not to pass. The Supreme Court of the United States holds as the law of such cases that if the reservation be of "minerals" it applies only to minerals known to exist when the government's title to the land passes; if it be of "mineral lands," it applies only to lands known to be such up to the same point of time. If at that time minerals, in the one case, are not known to exist in the particular land, or if in the other, the land is not known to be mineral, the title thereto passes, and passes absolutely and irrevocably.

This court has adopted the same rule of decision, following the United States Supreme Court in the holding. It has done so in unqualified terms, in the light of the very reservation pressed by the relator's counsel here,—the reservation of the Act of April 12, 1883, and with its express language before it. Schendell v. Rogan, 94 Texas, 585, 63 S. W., 1001.

To sustain the relator's contention these decisions must be ignored and repudiated. We decline to do so. They are in our opinion sound and unanswerable. They reflect the fair and open policy which ought to characterize all such legislation and which we believe was intended to characterize this legislation,—the policy of letting the sovereignty for the full protection of its rights determine before the sale what it wants to sell and what it wants to reserve, with the full authority to ascertain, in such cases as this, whether there is any mineral in the land or reason to believe there is, to classify it as such and sell it as such, or openly sell the surface and the minerals separately; but requiring, if no minerals are found or believed to exist and the land is in good faith classified as other than mineral and is sold in the belief by both parties that such is its nature, that that shall serve as an official determination of its character upon which the frequently unlearned purchaser may rely, in the belief that his title papers, or the records that constitute them,— which the law says, generally, shall be the evidence of right,—mean what they say and their face imports and are not subject to reservations and exceptions not expressed but only to be found buried in a statute of which he may have never heard. They enable the State to obtain at the time it should do so the full benefit of such a reservation, and they alike protect the rights of the settler who has dealt fairly with the State upon what amounts to an assurance by the State that the land sold him has been investigated by it and found not to be mineral in character and hence in the future will be exempt from attempt by others to ascertain whether it contains minerals or not. They accord with our notions of common right and justice. They deserve to stand as the law.

Davis v. Weibbold well illustrates the holding of the United States Supreme Court in cases where the statutory reservation from the grant was of "mines" or "minerals," as distinguished from "mineral land." The suit was by a holder of a mining claim for the possession of certain premises under his claim. The title to certain lots within the premises was held by the defendant under grant by the government for townsite

purposes executed before the mining right was issued. The question was whether the title to certain minerals not known to be contained in the lots of the defendant when the government conferred title to them, passed with that title, since its decision determined the right of the plaintiff to possession for the purpose of prospecting under his mining claim. It is this possession to which the court referred in the opinion where it speaks of "the defendant being deprived of his premises." It was a suit for possession. If the relator, Greene, had procured a permit under the Act of 1913 and were suing for possession of certain parts of this land in order to exercise the right to prospect under the permit, the cases would be identical. As it is, the question determinative of both is identical and its decision equally conclusive. The townsite Act, the source of the right to the defendant's lots, as the Act of 1883 is the source of the right to the land here, contained this declaration:

"No title shall be acquired under the foregoing provisions of this chapter to any mine of gold, silver, cinnabar or copper, or to any valid mining claim or possession held under existing laws."

It would be difficult to state more explicitly than does this language that no title to the minerals of gold, silver, cinnabar or copper in lands granted under the Act should pass by the grant of the land, but that such title was reserved and should remain in the government.

In the opinion it was said:

"When the entry of the townsite was had, and the patent issued, and the sale was made to the defendant of the lots held by him, it was not known,—at least it does not appear that it was known—that there were any valuable mineral lands within the townsite, and the important question is whether in the absence of this knowledge the defendant can be deprived under the laws of the United States of the premises purchased and occupied by him because of a subsequent discovery of minerals in them and the issue of a patent to the discoverer. After much consideration we have come to the conclusion that this question must be answered in the negative."

Further in the opinion, after directing attention to the fact that the terms of the reservation were to be read in connection with the clause protecting existing rights to minerals, and with the qualification uniformly accompanying exceptions in Acts of Congress of mineral lands from grant or sale,—as here the terms of the reservation in the Act of April 12, 1883, are to be read in the light of the contemporary Act of the same Legislature, that is, the Act of April 14, 1883 (9th Gammel's Laws, 406), which provided for the issuance by the Land Board of mining rights for minerals in the same lands dealt with by the Act of April 12, 1883, and which, as declared by this court in Colquitt-Tigner Mining Co. v. Rogan, 95 Texas, 454, imposed upon the Land Board powers in respect thereto that "involved the duty of ascertaining, as far as practicable, *what portions of the lands to be sold contained minerals,*" the court said:

"Thus read, they must be held, we think, merely to prohibit the pas-

sage of title under the provisions of the townsite laws to mines of gold, silver, cinnabar or copper, *which are known to exist,* on the issue of the townsite patent, and to mining claims and mining possessions in respect to which such proceedings have been taken under the law or customs of miners as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried unknown in the depths of the earth."

Quoting with approval the following from Cowell v. Lammers, 10 Sawyer, 246, 21 Fed., 200:

"If land, which a party has actually occupied, possessed and peacefully enjoyed for a long series of years, claiming title under a patent of the United States fifteen years old, can be entered upon and prospected for a mine by any trespasser who chooses to do so, and a mine being found, the mine can be located, and taken out of the patent on the vague and uncertain exception of the patent in question—one which excluded all mineral lands should any be found to exist in the tracts of land described,—it can be done fifty or a hundred years hence, and the patent instead of being a muniment of title upon which the patentee or his grantees can rest in security, would be but a delusion and a snare."

The opinion further declares:

"In connection with these views it is to be borne in mind also, that the object of the townsite Act was to afford relief to the inhabitants of cities and towns upon the public lands, by giving title to the lands occupied by them, and thus induce them to erect suitable buildings for residence and business. Under such protection many towns have grown up on lands which, previously to the patent, were part of the public domain of the United States, with buildings of great value for residence, trade and manufacture. It would in many instances be a great impediment to the progress of such towns if the titles to the lots occupied by their inhabitants were subject to be overthrown by a subsequent discovery of mineral deposits under their surface. If their title would not protect them against a discovery of mines in them, neither would it protect them against the invasion of their property for the purpose of exploring for mines. The temptation to such exploration would be according to the suspected extent of the minerals, and being thus subject to indiscriminate invasion, the land would be to one having the title poor and valueless, just in proportion to the supposed richness and abundance of its products. We do not think that any such results were contemplated by the Act of Congress, or that any construction should be given to the provision in question which could lead to such results. Our conclusion, as already substantially stated is, that Congress only intended to preserve existing rights to *known* mines of gold, silver, cinnabar or copper, and to known mining claims and possessions against any assertion of title to them by virtue of the conveyances received under the townsite Act, and not to leave the titles of purchasers on the townsites to be disturbed by future discoveries."

In Dower v. Richards, 151 U. S., 658, in approving a decision of the

Supreme Court of California placing the same construction upon this statutory reservation, the court said:

"There can be no doubt that the decision of the Supreme Court of the State in this respect was correct. It is established by former decisions in this court, that, under the Acts of Congress which govern this case, in order to except mines or mineral lands from the operation of a townsite patent, it is not sufficient that the lands do in fact contain minerals, or even valuable minerals, when the townsite patent takes effect; but they must at that time *be known* to contain minerals of such extent and value as to justify expenditures for the purpose of extracting them.; and if the lands are not known at that time to be so valuable for mining purposes, the fact that they have once been valuable, or are afterwards discovered to be still valuable, for such purpose, does not defeat or impair the title of persons claiming under the townsite patent."

In Shaw v. Kellogg, 170 U. S., 312, 42 L. Ed., 1050, where the grant authorized by Congress was only of "non-mineral lands," which, of course, amounted to an exception from the grant of lands which were mineral, the court, applying the same reasoning, declared:

"Nor were they (the grantees) at liberty to select lands which were then *known* to contain minerals. Congress did not intend to grant any mines or mineral lands, but with these exceptions their right of selection was co-extensive with the limits of New Mexico. We say 'lands then known to contain minerals,' for it can not be that Congress intended that the grant should be rendered nugatory by any future discoveries of mineral. The selection was to be made within three years. The title was then to pass, and it would be an insult to the good faith of Congress to suppose that it did not intend that the title when it passed should pass absolutely, and not contingently upon subsequent discoveries. This is in accord with the general rule as to the transfer of title to the public lands of the United States. In cases of homestead, pre-emption or townsite entries, the law excludes mineral lands but it was never doubted that the title once passed was free from all conditions of subsequent discoveries of mineral."

In Schendell v. Rogan, 94 Texas, 585, 63 S. W., 1001, this court, as we have said, adopted this same rule of decision in relation to a later reservation of these same school and asylum lands "containing valuable mineral deposits," found in the Act of 1895. The decision was expressly based upon the holding of Davis v. Weibbold. The legislation of the State on the subjects of the school and asylum lands and reservations of minerals therein, beginning with the Acts of 1883, is there reviewed, including the later Acts of 1887, 1889 and 1895. It is unnecessary to repeat that here. With the directness and emphasis which marked all his opinions, Judge Brown in there speaking for the court of the reservation expressed in the Act of 1895, said:

"The language, 'All public school, university, and asylum lands . . . containing valuable mineral deposits are hereby reserved from sale or other disposition except as herein provided,' etc., was not intended

to operate upon lands which *had not been found* to contain valuable mineral deposits *and were not apparently mineral lands."*

If such a reservation did not operate on lands not known to be mineral, how can a reservation of minerals themselves operate on minerals not known to exist?

Citing Davis v. Weibbold for the ruling, it was then added,—and this statement is significant as showing that in the court's view no substantial distinction in principle could be drawn between a reservation of "mines or minerals in land" and a reservation of "land containing minerals":

"In the case last cited, language very similar to that used in our statute was held to reserve only such lands as were known to contain minerals, and a sale having been made and the land patented *before it was known that there were mineral deposits therein,* the purchaser took the land and *all minerals contained in it."*

Following this concise statement as to the effect of Davis v. Weibbold, it was emphasized that according to our decisions, as has been often declared, a sale by the State and compliance by the purchaser gives a vested right in the land,—just as effectually as was given by the patent in that case under the laws of the United States.

The land involved in Schendell v. Rogan had, like the land here, been classified and sold as agricultural land. Schendell, the owner, was before the court asking for a mandamus to compel the Land Commissioner to issue him a patent absolute and unconditional. His right to such a patent depended upon whether the sale to him of the land carried the minerals which might be in the land. The Commissioner refused to issue him an absolute patent, contending that since the land had not been sold as mineral land as provided by the mineral Act of 1895, and since all school and asylum lands not so sold were reserved from sale by the reservation in the Act, above quoted, the minerals that might be in the land still belonged to the State and Schendell was not entitled to a patent which did not expressly reserve the minerals to the State. There is no substantial difference between the contention and that here made by the relator which only arises under a different, but, in legal effect, a similar reservation. Both amount to the same thing, which is, that under the respective reservations the title to the minerals did not pass.

The court squarely overruled the contention. It held that with the land sold as agricultural land, not then known to contain any valuable minerals, and being, therefore, not apparently mineral land, the title to any minerals in it passed with the title to the land, and the owner was entitled to an absolute patent, to require the issuance of which it awarded its mandamus writ. Adverting to the fact that four Governors and four Attorneys General had construed the laws on the subjects of the sale of agricultural, pasture and timber lands and the sale of such lands as contained valuable mineral deposits, in force since 1889 up to that time, to mean that in sales of land as agricultural land a good title was con-

ferred on the purchaser, entitling him upon compliance with the general provisions to a patent granting the land without reservation, carrying the title to any minerals in the land, and that the Commissioner's contention would convert such titles from fee simple, absolute titles into titles subject to the claim of the State to all minerals that might be found in them, the opinion concludes:

"The inclosures of those men who have settled upon the land would be liable to the intrusion of prospectors and speculators, with the right to dig ditches, sink shafts, and bore wells for the purpose of ascertaining whether or not minerals are contained therein. No provisions are made for protecting the rights of the State's vendees, nor rules regulating the operations of the seeker after minerals, but the unqualified right is given to explore the lands without regard to the rights of others, which shows that it was not intended to apply to lands which the State had sold. *It is inconceivable that the Legislature intended that such results should flow from the policy that it adopted, which at all times has been most liberal for the protection of the actual settler upon the public domain.*"

The mining Act of 1883, which has been once referred to, has an important bearing on this question. It was a contemporaneous Act with that of April 12, 1883, in which the reservation here relied upon by the relator and which likewise is the basis of the personal position of the Land Commissioner, was expressed. It was approved two days later. Each is to be construed in the light of the other. The subject matter of the mining Act was the minerals in the school and asylum lands. It was enacted to give beneficial effect to the reservation of those minerals expressed in the Act of April 12 and repeated as one of its own sections, by providing a method whereby they might be made of use to the State as well as individuals. The plan adopted did not involve their sale, but provided for the granting of mining claims for the working of mines containing the minerals, upon a royalty basis. The Act placed their control in the hands of the Land Board with ample powers to effect its purpose. As already stated, those powers, under the holding of Colquitt-Tigner Mining Co. v. Rogan, 95 Texas, 454, contemplated that the Board would ascertain as far as practicable what portion of the lands contained minerals—a wholly vain power and a wholly useless duty if, regardless of any such ascertainment, the title to the minerals in all lands sold, whether known or unknown, was to remain in the State through force of law. The powers conferred related to the minerals in all the school and asylum lands. Yet there is no suggestion in the Act that the board should have authority to grant a mining claim for location upon any of the lands which had been classified and previously sold as agricultural land. It provided no protection for the owner of such land in respect to the possible location of mining claims upon the surface, as to which, under any view, his right would be paramount. It provided for no payment for the taking of his surface, though if it applied to such land, under its broad and literal terms, locations for separate mines over the entire surface of the previous grant

might be authorized and permitted. The whole subject was left untouched and unregulated. Why was this? Is it to be believed that the law would have been left in such state, subjecting the rights of the settler to such jeopardy, if the Legislature intended that lands sold as agricultural, timber or pasture lands might be prospected for minerals at any time in the future? This shows plainly, we think, that the Legislature did not intend that lands so sold should be subject to such claims where at the time of their sale the existence of minerals in them was unknown. The reservation of the minerals was to make possible the ascertainment of their probable existence in any of the lands, so as to give land in which their existence was probable the character and status of mineral or apparently mineral land, to be dealt with accordingly; with the power in the Land Board, as to such land, to make the use of the minerals which the Act provided, without any disposition of the surface rights, or to sell such land with the mineral rights reserved so that the State's right to the minerals should not pass and would not be lost, but might thereafter be separately availed of for its benefit. In our opinion and under the decisions cited, the reservation was not intended to have effect upon lands classed as other than mineral or apparently mineral where the existence of minerals in them was not known when the land was sold. In the absence of such knowledge by the officials of the State and purchasers, their classification in good faith as agricultural, timber or pasture lands was to serve as an official determination that such was their character, and the State's title to them, if the purchaser had complied with the general provisions, was to pass wholly without reservation and hence subject in the future to no kind of adverse claim at the hands of the State.

Schendell v. Rogan was followed by the court and its ruling restated in Chappell v. Rogan, 94 Texas, 650, 63 S. W., 1006. It was there declared that a purchaser of these lands in the position of Armstrong here, *"secures a right free from any claim of the State for minerals that may be thereafter found in the land."*

As to this reservation, and all like reservations, it may with apparent reason be urged that by the express terms of the reservation there is no authority of law for the grant of that which by those terms is excepted from the grant, and therefore that the grant can pass no title to the subject of the exception. This states the position of the relator as strongly as it can be stated. It presents what seems to be an unanswerable argument. It does not defy analysis, however, so let us examine it. It is plausible but it is not sound. It is not sound because its necessary result is to leave open for indefinite time—to all futurity—the determination of whether that which an ordinary grant of land purports to pass is within the exception.

Under such a rule, the State might not know for fifty years whether minerals in fact existed in the land granted, and accordingly whether it had any right to them. By the same rule, the settler's land would never be free from invasion under the right of the State to at any time

in the future explore it, and all of it, for minerals, or to authorize its exploration.   He would never know when his right to undisturbed possession of even the surface had matured.   In truth, it never would mature.   The minerals, oil and gas are fugitive and vagrant in their nature.   They percolate and wander beneath the surface of the earth. Texas Company v. Dougherty, 107 Texas, 226, L. R. A. 1917F, 989, 176 S. W., 717.   They might not be in place in the land when it was granted.   The land might not then contain them.   It might happen, however, that at some remote period they would find lodgment or form there.   Yet, under such a rule, if they are then discovered the right to them,—which it is here claimed will attach whenever they are discovered,—would be, not in the owner of the land, but in the State or some prospector holding a permit from the State.   The law does not permit, nor can it wisely or justly permit, the title to granted land or to any valuable substance contained in granted land to remain in any such state of indefinite abeyance.   For actual rights to exist and for either governments or men to have security under them there must come a time when, if by their nature left uncertain, they shall be made certain.   Under such a reservation as that of the Act of 1883, where there could be no right in the State to the minerals unless they in fact exist, there must be some point of time for determining whether they do exist, so that the State's right may be ascertained and reduced to certainty.   And equally for the settler whom for its benefit and development the State encouraged and invited to convert a perilous frontier into a region of homes that it might some day become in itself the seat of empire, the thickly populated abode of a strong and devoted citizenship, there should be a time when he might know what rights his grant actually carried and whether he was secure in his possession of them.

Were these important rights, both of the State and the settler, to be left indefinitely contingent?   Were they to continue in unlimited suspense?   Were they to be determined by or be subject to the mysterious processes of natural forces beneath the surface of the earth at possibly remote periods in the future?   It is not conceivable that the Legislature so intended.   If not, there being no express provision in the law on the subject, at what point of time did it intend that they should be determined?   That is the real question which arises under this legislation. Its determination is conclusive of this controversy; and our own decisions, together with those of the United States Supreme Court, conclusively set it at rest.   The reason for their holding, that under such reservations as this the minerals pass with the land if their existence in the land is unknown when the sovereignty confers its title, necessarily is that that is the best and fairest time for determining as to their probable existence, and is, therefore, the time which the law should adopt.   Without other aid, it demonstrates the soundness of the holding.   It reveals the justness of it.   It commends it as having the essence of right and as being the inevitable decision of the question.

This being the primary question in the case, we have given it this

much attention because it deserves to be met fully and fairly, and to be determined no less correctly. That we have striven to do, with proper respect for opposing views ably presented, but firmly convinced that this is the true determination of it.

If there were any doubt as to this being a proper disposition of this question, the case must, we think, be resolved against the relator because of the statute—found in the revision of 1895, article 4041, which, under the opinion in Cox v. Robison, 105 Texas, 426, 150 S. W., 1149, operated as a validation of titles of purchasers of public lands prior to its adoption in 1895 to the minerals in lands granted them. That statement in the opinion was not inadvertent. It was made deliberately to prevent confusion in titles because of that decision which upheld the validity of the legislation of 1895 that authorized the reservation of the minerals in lands to be sold in the future. That part of the opinion is here assailed as a dictum, but we do not believe it is to be so regarded. The question before the court was an important one. It involved a constitutional provision and the effect of that provision upon the title to minerals both in lands sold before the adoption of the present Constitution and thereafter, as well. The broad question in both aspects was before the court. We believed it our duty to state what in our opinion was the existing status of all such titles under the written law of the State, and did so.

That opinion in this respect is also challenged because it is said that the statute referred to, which reads, "The State of Texas hereby releases to the owner or owners of the soil all mines and minerals that may be in the same, subject to taxation as property," was but a re-enactment of a statute of 1879 in identical terms. Let that be admitted, yet when the nature of the statute is looked to there could have been only one purpose in bringing it forward in the revision of 1895. That was to extend its operation up to that time. We recognize the general rule in regard to the re-enactment of former laws in revisions. But that is a rule of construction. As said by Judge Williams, a former eminent member of the court, in State v. Burgess, 101 Texas, 525, 109 S. W., 922, "It is never conclusive."

The Legislature is not to be credited with doing a vain or useless thing. The laws of a revision have the force of laws, not because they are the work of the codifiers, but only because they are the enactments of the Legislature. There could have been no reason for re-enacting this statute if it was only to have the effect it had in 1879. It had, in such event, fully spent its force and was thereafter a dead letter. If the Legislature in 1895 had, without doubt, desired to extend the operative force of the statute over the period between 1879 and 1895, in what terms could it have better expressed that intent than those of this statute? Having regard for the nature of the statute and the only purpose such a statute could subserve, we think its re-enactment in 1895 was to extend its provisions to that time, just as fully so as it was intended in the readoption in the successive Constitutions of 1869 and

1876 of the original validating provision of the Constitution of 1866,—expressed in substantially the same terms as this statute,—that its operation should be extended over those respective periods. The re-enactment of the statute in 1895 was in pursuance of the same policy reflected in the successive readoption of the like constitutional provision, and was for the same purpose.

Treated as a validating Act, as it should be, the statute granted no relief to purchasers of school lands and was not unconstitutional under section 4 of article 7 of the Constitution, as that provision has been uniformly construed. It merely confirmed to them that which they had already bought and paid the State for, or for which it held their obligations undiminished by its operation.

For the same reason it was not unconstitutional under section 5 of the same article. It was no appropriation of the school fund to foreign purposes. While these lands were by the Constitution dedicated to the school fund, the school fund acquired no title to them as against the State. The State did not thereby become a mere trustee. As the sovereignty, it continued to own the lands just as fully as before their dedication. This has been definitely settled. Judge Stayton settled it in Smisson v. State, 71 Texas, 222, 9 S. W., 112. See, also, Imperial Irrigation Co. v. Jayne, 104 Texas, 395, Ann. Cases, 1914B, 322, 138 S. W., 575. The State, not the school fund, is the source of titles to school lands. And if the Legislature wished to place it beyond doubt that a purchaser of school land had bought and acquired in the purchase of the land all that was in the land, that was, in our opinion, an authority within its lawful powers.

For these reasons we hold that a purchaser, in the position of Armstrong, of school lands under the legislation of 1883, acquired title to the minerals in the land sold him, and that it is not subject to any claim by the State. Such settlers went upon these lands relying upon the good faith of the State. It is public history that in many instances they have undergone a hard experience. As a rule they were poor men. Many of them have lived there under rude conditions. Through long years their right to all within their lands, save in Schendell v. Rogan and Chappell v. Rogan, where it was confirmed by this court, was not challenged until, apparently, by the Act of 1913. Now, after all this time, when it develops that the lands have possibly become valuable it is proposed to deprive them of that which makes them valuable. We do not believe the State should be permitted to so enrich itself at their expense. A law which would warrant such a result should, in our opinion, be so plain and unmistakable that no court in good conscience could refuse to give it effect. The school fund is a sacred fund and should be so cherished. But the obligations, the good faith of the State, are equally sacred. An enhancement of the school fund at their sacrifice would make it only poorer. These elements all enter into this case. They do not change these Acts of the Legislature, but they should be properly considered in any attempt to arrive at what the Legislature

meant in their enactment. If this mandamus is granted, this land, under a permit issued in virtue of the Act of 1913, may, against the will of its owner, be turned into an oil field for the benefit of strangers. The best or most useful part of the surface may be made the field of mineral exploration. Under the terms of that Act the holder of a prospecting permit is given the right of eminent domain for all purposes necessary either to the development of minerals or to the use of the minerals found within the area of the permit,—for buildings and works essential to mining operations, even railroads. The character of the land as a farm—the purpose for which the State sold it, may be destroyed. The surface rights may be rendered no longer of use to the owner. It is possible for the surrender of his possession to be compelled. No such results to settlers of agricultural lands could, in our opinion, have been within the contemplation of the legislation of 1883. That was not the policy of the laws of the State of that time.

The mandamus is refused.