The motion for leave to file the application for mandamus is accordingly overruled.

---

**DONOHO et al. v. HUNTER et al.   (Motion No. 6962—3869.)**

(Commission of Appeals of Texas, Section B. Oct. 14, 1926.)

**1. Evidence ⬤⟞83(1).**

Ordinarily it is not assumed that a state official exceeds his authority and issues an oil and gas permit on agricultural lands, but that he will obey statutes in force.

**2. Appeal and error ⬤⟞891.**

New evidence cannot be submitted on appeal to Supreme Court, but must be shown in another trial.

**3. Mines and minerals ⬤⟞54(4)—Evidence held to show that purchaser of land possessed sufficient facts to put him on inquiry as to existence of mineral permits, and that pursuit of inquiry would have disclosed permits.**

In action to rescind purchase of land for fraudulent misrepresentations that there were no outstanding mineral permits, evidence *held* to show that purchaser was in possession of sufficient facts to put him on inquiry as to such permits, and that diligent pursuit of inquiry would have revealed existence of permits.

**4. Mines and minerals ⬤⟞54(4)—Purchaser, prematurely stopping inquiry into existence of mineral permits on land purchased, when diligent inquiry would have revealed permits, could not have contract canceled for misrepresentations concerning existence of permits.**

In action to rescind purchase of land for fraudulent misrepresentation that there were no outstanding mineral permits, purchaser was under duty to pursue his inquiry until he arrived at facts, and, having prematurely stopped his inquiry when diligent pursuit thereof would have disclosed permits, he cannot have contract rescinded.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

On second motion for rehearing. Motion granted, and judgment reversed and rendered.

For former opinion, see 276 S. W. 174.

See, also, 242 S. W. 282.

D. W. Odell, R. S. Phillips and S. C. Padelford, all of Fort Worth, for plaintiffs in error.

Marvin H. Brown and Chas. T. Rowland, both of Fort Worth, for defendants in error.

POWELL, P. J. The nature and result of this case have been fully stated in the opinion of the Court of Civil Appeals. See 242 S. W. 282. Briefly speaking, this was a suit by defendants in error to cancel a deed because of fraud perpetrated by plaintiffs in error. The district court did rescind the trade and permit the grantees in the deed to recover their purchase money. That judgment was affirmed by the Court of Civil Appeals, and reported as aforesaid.

Writ of error was granted by the Supreme Court, and the cause referred to us. Upon our recommendation, the judgments of the district court and Court of Civil Appeals were affirmed by the Supreme Court on October 14, 1925. See 276 S. W. 174.

In due course, plaintiffs in error filed a motion for rehearing. That motion, upon our recommendation, was overruled by the Supreme Court on December 2, 1925.

Later plaintiffs in error sought and secured permission from the Supreme Court to file a second motion for rehearing. That motion has been filed in the Supreme Court, which court has referred same to us for recommendation.

We have gone very carefully into this second motion for rehearing, together with the written argument in support thereof, as well as the answer of defendants in error thereto. As stated by the Court of Civil Appeals in its opinion, and concurred in by our court in its original opinion, this record has been a very burdensome one to handle. This fact is due to the size thereof, and the length of the various briefs and arguments, many of which are overlapping and duplicating. The second motion for rehearing is clear, brief, and to the point. This circumstance has constituted a refreshing change in the method of presentation. We commend it to the bar generally.

In the first place, it is contended that our original opinion is in direct conflict with the very able opinion by Chief Justice Phillips in the case of Greene v. Robinson, 109 Tex. 367,

---

⬤⟞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

210 S. W. 498. In support of this contention, counsel for the motion quote briefly from the statement of facts, which shows that title to the *land* involved had come down through mesne conveyances, to Donoho; there was nothing in the record to show that the land had ever been classified by the state as mineral land; that, in the absence of some such proof, the burden being on plaintiffs in the trial court, it must be held that the land had been sold by the state without any mineral classification or reservation.

[1] It was held in the Greene Case, supra, that the state had no mineral rights in land admittedly classified and sold as agricultural land. If that situation were apparent in the case at bar, our opinion would have been in conflict with that in the Greene Case. But such a situation is not apparent. On the contrary, the lower court evidently tried this case upon the theory that the very contract entered into by and between the parties, and introduced in evidence, showed that the state had reserved its one-sixteenth interest in the minerals. The court evidently decided that, in the absence of any proof to the contrary, that would be a sufficient circumstance to show that this property was claimed as mineral land. Especially might that have been the reasonable inference when there was also proof of the oil and gas permit issued to Bartholomew. Ordinarily, it will not be assumed that a state official exceeds his authority and issues an oil and gas permit on agricultural lands, but that he would obey the statutes *at that time* in force. However, we do not pass upon the question as to whether or not the lower courts were justified in assuming that this was mineral land, so classified and sold by the state. It is not necessary for us to do so, in view of our conclusion upon another assignment in the second motion for rehearing, which we will later discuss. Even if we should conclude that the lower courts had incorrectly held this to be mineral land, we would still feel that, in *reversing* the case, we should *remand* rather than *render*, in order that the facts might be more fully developed upon another trial. See Associated Oil Co. v. Hart (Tex. Com. App.) 277 S. W. 1043.

[2] Counsel for defendants in error present an affidavit and certificate showing that this land was duly classified as mineral land and so sold. But new evidence cannot be submitted in the Supreme Court. It would have to be shown on another trial in the district court, where the point could be more fully developed, and all parties have the right to question the witnesses.

[3] This brings us to the assignment in the second motion for rehearing, which we think is controlling. It is contended that the undisputed facts in this record show that Hunter was put upon inquiry as to the existence of this oil and gas permit on this 320-acre tract; that, had he pursued such inquiry

with ordinary care, he would easily have discovered this permit; that, as a matter of fact, he did rely upon his own investigation, and that neither Donoho nor his associates did anything to stop or curtail his investigation. In our original opinion we thought there was evidence in the record to sustain the judgments of the lower courts upon these fact issues. But, going through the statement of facts again, we have finally concluded that Hunter was in possession of sufficient facts to put him upon inquiry, and, having prematurely stopped his inquiry once begun, under the circumstances surrounding him at the time, he cannot now cancel this contract because of the alleged fraudulent representations by plaintiffs in error.

In the first place, the contract, executed April 12, 1920, involving the sale in suit, expressly recognized the right of the state to a one-sixteenth interest in the minerals. Hunter knew that the state, under the law, might have issued a permit at any time for the development of its mineral interest in these lands. So he testified that he was bothered about that point. He did not seem to want the land if there was any outstanding permit. His testimony is very interesting, and we quote from it to show what he did in Reeves county before going to Fort Worth to close the deal. His testimony reads as follows:

"Mr. Weathered went with me to the records in Reeves county to look up this matter. I don't know as anybody else went with us. I do remember Mr. Weathered going with us. I don't think Mr. Anderson went with us. I met Mr. Anderson and Mr. Golden one day and Mr. Weathered the next day, and the second day was the day I went to look up the records. We went to the county clerk's office to look up the records, and some one there in the office helped us look them up; I don't remember learning the man's name. Either I or some one in my presence told the man in the county clerk's office what we were looking for. We told him we were looking up the records on section 4, block 55, in regard to a mineral permit. In other words, we told this clerk in the county clerk's office, that we were examining the records to find out if there was any mineral permits against this particular tract of land in controversy herein, and then the other parties who were with me, and the clerk, went and examined the records for that purpose. We found that the records were in such shape that the clerk could not give me any answer, and advised me to wire to the land office at Austin. We didn't find any permits there in the county clerk's office at all. I didn't find anything on record there in a way that I could understand it. I didn't find the permits that I have introduced in evidence here. I didn't find an application of a man by the name of Bartholomew for a permit, on record there in the county clerk's office.

"As I have stated, when I went to the county clerk's office they advised me to write to Austin to find out about the matter; I think we came to Fort Worth about two days after seeing the county clerk. I went to the Reeves county abstract office; Mr. Weathered went

with me over there; I don't think Mr. Golden was along, as I remember. I told the Reeves county abstract people what I was looking for —what I had come over there for. I told them I was looking to see if there was any mineral permits on the land that I was figuring on buying, which was the land involved in this suit. Mr. Weathered helped me to look for the permits there. I didn't know any of the men in the office. They were strangers to me. The abstractor helped us look the matter up. I don't know what his name was; he was not introduced to me, and I have not found out since, who he was. As well as I remember, Mr. Rowe was in a different abstractor's office. In this abstractor's office I didn't find anything there showing a mineral permit, or an application for a mineral permit.

"As to whether I saw anything like the following, in the abstractor's office: 'Postoffice address, Cleveland, Ohio; date, April 22, 1918. To the County Clerk of Reeves County, Texas: I desire to obtain the right to prospect for and develop petroleum oil or natural gas on the following described lands: All of sections 2, 3, 4, and 11, block 55, public school land; certificate ——. No. acres 2564, in Reeves County, Texas.' I will state that I don't remember seeing anything like that, because Mr. Weathered told me that there was no permit on this land. I was looking for a permit at that time, but I took Mr. Weathered's word for it that there was no permit on it.

"One of the first questions I asked in the county clerk's office and in the abstractor's office was whether or not there was any outstanding mineral permits on this property; I mentioned it out there at the time. Mr. Weathered told me out there that there had been a permit filed on this land at one time, but that he could show me that it had already been canceled, and then I went to look for it. Mr. Weathered did the talking at the county clerk's office.

"I was the one who wanted to be satisfied about the permit; I wanted to be satisfied about it. When Mr. Weathered told me that there had been a permit on this land, but that he could show me where it was not then good, I was willing to take his word, because I believed there was no permit on it. I went to the county clerk's office because Mr. Weathered was going to show me that there was no permit on the land. I didn't tell Mr. Weathered that that was all right, and that I would just take his word for it. I wanted the abstract so that I would have the land in a condition where I could sell it, and so it would show that I had title to the land.

"After we went to the county clerk's office and could not find what we wanted there, Mr. Weathered asked me to go over to the abstractor's office with him. When I questioned him about the matter, he said that he could show me that there was no permit on this land at that time—he asked me to go with him over to the abstractor's and he could show me that the permit had been canceled. After he took me over to the county clerk's office and the clerk could not find anything I wasn't exactly satisfied, because he told me that the records were in such shape that he could not tell very much about it. I was not altogether satisfied when I left the abstractor's office.

"Mr. Weathered never gave me the letter

287 S.W.—4

that he had received from the land commissioner; he told me he had the letter and said he would show it to me when we got to Fort Worth, but he did not. I don't remember seeing the matter that you read to me a while ago, on the abstract records in Reeves county. I think I remember seeing the following: 'E. E. Bartholomew to the Cleveland Oil Company; assignment of oil and gas lease, recorded in volume 46, page 145, Deed Records of Reeves County, Texas'—or something like that, but at that time Mr. Weathered told me that this stuff had already been canceled, and that he had letters to show in the Fort Worth office that it had been canceled.

"As to whether I remember seeing a transfer of permit dated September 15th, from E. E. Bartholomew, clerk, and Sol Moses, to the Cleveland Oil Company, I will state that I remember where there had been two or three transfers made, but he told me that they had all been canceled."

Hunter and Weathered then proceeded to Fort Worth for the purpose of closing the deal. It was closed three days after the contract had been executed. As to what happened before the closing, Hunter testified:

"After making this contract that I have testified about herein, I came on to Fort Worth to close up this transaction. At that time I was acting for both myself and Mr. Collins; we were partners in this transaction. I went into the office of the defendants herein, to close up this transaction, in Fort Worth; their office was located in the 500 block on Main street; I have forgotten the street number. When I got to Fort Worth, Mr. Donoho met Mr. Weathered and myself at the T. & P. passenger station. I came from West Texas to Fort Worth with Mr. Weathered, for the purpose of closing this deal; I came from Pecos, Tex., to Fort Worth. My home is in McCaulley, Tex., Fisher county. Mr. Collins lives at McCaulley, Tex. I never had had any experience in buying and selling land before this transaction, with the exception of two town lots; that is all the experience I have had in buying and selling lands previous to this transaction. When I got to the office of the defendants here in Fort Worth, Mr. Donoho, Mr. Thompson, and Mr. Weathered were all there, and we discussed this matter. When we began discussing this matter there in the office, I believe the first question that was asked was by me. I asked in regard to the permits on this land, and as to whether or not there were any permits on this land; by permits I mean state mineral permits. They told me that there were no state mineral permits on this land. All three of them told me that there were no permits on the land."

[4] A reading of Hunter's own testimony shows that he was very greatly exercised all the time about this state permit; that he did not rely on Weathered's statement that there was no such permit; that he continued to investigate the matter for himself, going to the office of the county clerk of Reeves county and then to the abstractor's office there. It is significant that the county clerk told him the safe thing to do was to wire the

general land office at Austin. Hunter was still not satisfied when leaving for Fort Worth. The first question he asked there, on his arrival, was about a state permit on the land. He says they all told him there was no permit. But there is no proof in the record that they persuaded him not to pursue his inquiry further by asking the general land office about the matter, as the county clerk, a disinterested witness, had recommended. In this very connection, Weathered had told Hunter he could show him in Fort Worth a letter from the land commissioner confirming his own statement about this matter. But, upon arrival there, it does not appear that Hunter even asked Weathered for that promised letter. Under facts like these, we think it must be held that Hunter was under the duty of pursuing his own inquiry, already begun by him, until he had arrived at the facts. Not having done so, he cannot recover. It is undisputed that he could have discovered this permit by following the advice of the county clerk and wiring the land commissioner. Hunter had actually seen on the deed records transfers which were persuasive that a permit had been granted. There was no cancellation of said permit on the record, from the evidence introduced. Weathered said it had been canceled, but the record indicated otherwise. Under conflicting circumstances of that kind, it became Hunter's duty to delay the closing of his deal until he could discover the true facts. See Waggoner v. Zundelowitz (Tex. Com. App.) 231 S. W. 727.

In view of what we have just said, it is not necessary for us to pass upon any other assignments in the motion. Hunter was not interested in the validity or invalidity of the oil and gas permit issued by the state. As we showed in our original opinion, he did not want the land with that permit outstanding. He was not buying a lawsuit. Since he could have discovered this very permit by proper inquiry, he doubtless would not have purchased the land at all, had he done his duty beforehand. His actions after the purchase show this conclusively. His trade, unfortunate though it may have been, was the direct result of his own failure to diligently pursue his inquiry to a full and final determination of the exact facts.

We recommend that the second motion for rehearing be granted; that the judgments of the Supreme Court, entered October 14 and December 2, 1925, be set aside and held for naught; that the judgments of the district court and Court of Civil Appeals be reversed, and judgment rendered by the Supreme Court in favor of plaintiffs in error.

CURETON, C. J. Second motion for rehearing of plaintiffs in error granted, and previous judgment set aside, and the judg-

ments of the Court of Civil Appeals and district court reversed, and judgment rendered for plaintiffs in error, as recommended by the Commission of Appeals.