**DALLAS JOINT STOCK LAND BANK OF DALLAS v. HARRISON et al.**

No. 13983.

Court of Civil Appeals of Texas.
Fort Worth.

Dec. 1, 1939.

Rehearing Denied Jan. 12, 1940.

Lawther, Cramer, Perry & Johnson, of Dallas, for appellant.

Stine, Bunting & Stine, of Henrietta, for appellees.

DUNKLIN, Chief Justice.

At a regular meeting of the Board of Directors of the Dallas Joint Stock Land Bank of Dallas, a corporation, held on November 14th, 1934, the following resolution was passed:

"Resolved, that H. W. Ferguson, the President, and H. O. Pool, the Treasurer of this Bank, or either of them, be and they are hereby authorized to sell and dispose of, to rent or lease for mineral development, any and all lands now owned by the Bank, or which may hereafter be acquired by the Bank, at such price or consideration as they deem most advantageous to the Bank and upon such terms as may be agreed upon, and to execute such title papers as may be necessary to sell, convey, rent or lease any and all of said lands; and

"Be it further resolved, that either of them be and they are hereby authorized to execute releases, transfers or assignments of any notes held by the Bank; and

"Be it further resolved, that the Secretary or any Assistant Secretary of this Bank be and they are hereby authorized to attest any document so executed by the President or Treasurer and to affix thereto the corporate seal of this Bank."

On July 15th, 1936, the Dallas Joint Stock Land Bank of Dallas, by H. W. Ferguson, its president, as seller, and W. B. Allen and M. E. Harrison, of Byers, Clay County, as buyers, executed a sales contract, by the terms of which the Bank agreed to sell and Allen and Harrison agreed to buy a tract of 440 acres in

Clay County, for a total consideration of $15,000, of which $1,500 was to be paid in cash and the balance evidenced by three promissory notes, one for $12,000 payable in 20 annual instalments, and two notes for $750 each, one maturing November 1st, 1936, and the other November 1st, 1937.

The contract embodied these provisions: "The seller agrees to furnish an abstract of title showing a marketable title to said land free of all liens not specifically mentioned, in the consideration for use in examining the title to said land. The buyer agrees to submit in writing his objections, if any, to said title within fifteen days from receipt thereof, and the seller agrees to perfect said title within a reasonable time thereafter. In the event the seller does not own all the minerals, it shall not be required to warrant the title to more than it owns, but the purchaser shall have the option to accept the title without all the minerals or reject the title if the seller does not acquire all the mineral rights within a reasonable time. The abstract shall be returned to the seller to be retained until all the purchase price is paid.

"This contract shall be closed on or before the 15th day of August, 1936, subject to the other provisions hereof.

"The seller shall pay all taxes up to and including the year 1935. All taxes thereafter shall be paid by the buyer.

"If there is any insurance on the property same shall be prorated as of the date of closing.

"The buyer has deposited the sum of $500.00 and a copy of this contract with Dallas Joint Stock Land Bank, which said sum shall be applied at the date of closing as a part of the cash consideration, but in the event the buyer fails or refuses to perform this contract then such sum shall be paid to the seller as liquidated damages."

Thereafter, the Bank executed to Allen and Harrison its deed, dated August 4th, 1936, but not delivered until September 21st, 1936, stipulating that for the consideration expressed in the sales contract, it "has granted, sold and conveyed, and by these presents does grant, sell and convey unto the said W. B. Allen and M. E. Harrison, of the County of Clay, State of Texas, except as below stated, all that certain lot, tract or parcel of land situated in the County of Clay, State of Texas, and described as follows: (Here follows description of the 440 acres covered by the sales contract).

"To have and to hold the above described premises, together with all and singular the rights and appurtenances thereto in any wise belonging unto the said W. B. Allen and M. E. Harrison, their heirs and assigns forever, and said grantor does hereby bind itself, its successors and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof, except any mineral interest which grantor does not own.

"There is reserved and excepted from this conveyance one-fourth of the minerals in and under the land hereby conveyed, but if none is produced from said land within ten years from the date hereof this conveyance shall cover the entire interest owned by grantor. Grantor's reserved interest is limited to the royalty payments and does not participate in bonus or delay rental payments. Grantor expressly gives to grantee, his heirs, administrators or assigns, the right to. lease without the joinder of grantor seven-eighths of the grantor's reserved undivided mineral interest under a standard form of lease providing for a royalty of at least one-eighth of the undivided interest reserved by grantor.

"But it is expressly agreed and stipulated that the Vendor's Lien is retained against the above described property, premises and improvements, until the above described notes, and all interest thereon are fully paid according to their face and tenor, effect and reading, when this deed shall become absolute.

"Executed by authority of the Board of Directors of the Bank as evidenced by certified copy of resolution hereto attached this the 4th day of August, 1936.

"(Signed) The Dallas Joint Stock Land Bank of Dallas, by H. O. Pool, Treasurer.

"Attest: J. A. Mounts, Assistant Secretary." And duly acknowledged (as the evidence introduced showed).

W. B. Allen and M. E. Harrison instituted this suit against the Bank to recover damages for alleged fraud and deceit, which induced them to purchase the 440 acres in controversy. The sales contract and deed were averred, followed by allegations that plaintiffs' execution and ac-

ceptance of same was induced by representations made to them by certain duly authorized agents of the Bank, including one J. A. Mounts, that 340 acres of the land was free of any oil and gas lease, while in fact there was then an outstanding, valid and duly recorded oil and gas lease on the entire 440 acre tract, in favor of the Texas Company, executed by the Bank of date October, 1932, running for ten years from its date and as long thereafter as oil is found in paying quantities. That plaintiffs paid the defendant the cash consideration of $1,500 and executed the notes, as stipulated in the sales contract; that had the 340 acres been free of the prior outstanding oil and gas lease, it would have been worth $10 per acre more than it is worth with said lease outstanding; by reason of all of which plaintiffs have sustained damages in the sum of $3,400, for which a recovery was sought.

The answer of the defendant included a general and special demurrer, general denial and specific verified denial of agency of any of the persons alleged by plaintiffs to have made the misrepresentations which induced them to enter into the sales contract and to accept defendant's deed to the 440 acres in controversy.

Trial was before a jury, and in connection with special issues submitted, the court gave these general instructions and definitions:

"For representations of a fact to become an 'inducing cause' of the purchase of property, it is necessary that the person to whom the representations were made would not have bought the property had not such representations been made.

"By the term 'within the authority' is meant that an agent has been empowered and given the right by the principal to do the things in question.

"By the term 'apparent authority' is meant such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally and reasonably suppose the agent to possess.

"By the term 'market value' is meant the amount of money that a person desiring to sell, but not bound to do so, could, within a reasonable time, procure for such property, from a person who desires to buy, but is not bound to purchase the property."

Findings of the jury in answer to certain special issues were adverse to plaintiffs' asserted right to bind the defendant by misrepresentations of C. E. Harding, C. W. Filey and C. B. Harder, alleged to have been made by them while acting as the duly authorized agents of the defendant. Hence, the pleadings and evidence relating to those persons need not be further noticed.

But in answer to special issues Nos. 13 to 18, inclusive, the jury found that J. A. Mounts, as agent of defendant, represented to plaintiffs that only 100 acres of the 440 acres described in the deed was under an oil and gas lease; that the statement so made to plaintiffs by Mounts was within his actual authority, and also within the apparent scope of his authority; that plaintiffs believed said statement of J. A. Mounts that only 100 acres of the 440 acre tract was under an oil and gas lease, to be true, and were induced thereby to buy the land from the defendant.

According to further findings of the jury, the market value of the 340 acres in controversy in September, 1936, with the oil and gas lease then outstanding in favor of the Texas Company, was $25 per acre; but had the same been then free of said lease, its market value would have been $35 per acre, a difference of $10 per acre.

Upon that verdict, judgment was rendered in plaintiffs' favor for such difference, with accrued interest, aggregating $3,863.53, from which defendant has prosecuted this appeal.

The findings of the jury that the misrepresentation of J. A. Mounts that 340 acres of the tract covered by the deed were free of any oil or gas lease, was within his authority and apparent authority as defendant's agent, were duly challenged by the defendant in its motion for instructed verdict, in its motion for new trial, and also in this court as being without support of competent evidence.

According to a well settled rule of decisions, the test to be applied in determining the merits of that proposition is, was there any testimony which of itself was sufficient to support the finding, all testimony of a contrary effect being excluded. The following announcement in 2 Tex.Jur. para. 109, page 506, is supported by many decisions there cited:

"In the absence of proof that the agent's authority was conferred by writing, oral testimony is admissible to establish the extent of the agent's authority. And, even if the contract when reduced to writing

places limitations upon the agent's authority, the admission of oral evidence to prove fraudulent representations of the agent by which the contract was induced does not violate the rule that a written contract may not be varied by parol evidence.

"The fact of agency may be established by circumstantial evidence, and proof may be made of all the facts and circumstances that show the relations of the parties and throw light upon the character of such relations."

In Bradstreet Co. v. Robert Gill, 72 Tex. 115, 9 S.W. 753, 754, 2 L.R.A. 405, 13 Am. St.Rep. 768, this is said:

"The court refused a charge asked by defendant to the effect that if it was not the intention of defendant to make Finney its agent, and if it was not the intention of Finney to become its agent, to find for defendant on the plea in abatement. The refusal to give the charge is assigned as error. The intention of the parties, it is true, must control; but that intention is gathered from what was actually done or agreed by the parties, not from what they may have privately meant or supposed they meant. Agency or not is a question of law, to be determined by the relations of the parties as they in fact exist under their agreements or acts. If relations exist which will constitute an agency, it will be an agency, whether the parties understood it to be or not. Their private intention will not affect it. It was not error to refuse the charge."

"Corporations, in the conduct of their business, can only act by agents so placed as to represent them and to transact their business, and held out as being legally authorized agents. Therefore, persons dealing with them may assume that they are authorized to exercise at such places the powers necessary in the conduct and direction of the company's affairs. In other words an agent of a corporation has apparent authority commensurate with the business entrusted to him; a person may ordinarily deal with him in matters within such authority without regard to limitations on his authority that are not brought to notice. Illustrative of this principle, proof of the character of the corporation, the office and the official act by which the corporation is sought to be bound—if within the customary powers of the officer—is sufficient, at least prima facie, to establish the official act as that of the corporation." 2 Tex.Jur. pages 427-428; Helms v. Home Owners' Loan Corporation, 129 Tex. 121, 103 S.W.2d 128; San Antonio Joint Stock Land Bank v. Taylor, 129 Tex. 335, 105 S.W.2d 650; Waggoner v. Zundelowitz, Tex.Com.App., 231 S.W. 721; Evans v. Beard, Tex.Civ. App., 70 S.W.2d 253; Brooks v. Mitchell, Tex.Civ.App., 27 S.W.2d 371; Wardlaw v. Pace, Tex.Civ.App., 66 S.W.2d 350. See also opinion of Justice Speer of this court in George Kadane et al v. C. W. Clark, Tex.Civ.App., 134 S.W.2d 448, decided September 29th, 1939.

It is a further familiar rule that innocence of wrongful intent will not remove or lessen actual damages resulting from the acts of the wrong-doer nor relieve him from liability for such damages. In appellees' briefs, many facts and circumstances reflected in the statement of facts are noted as tending to show that the statement made to plaintiffs by J. A. Mounts, which the jury found induced them to purchase the 440 acres in controversy, was within the apparent scope of his authority to bind defendant thereby, notwithstanding his official designation was that of Assistant Secretary. It would unduly extend this opinion to review all the circumstances related; only a few of them will be noted.

Plaintiffs had been cultivating the land, and for more than a year had contemplated a purchase of it and had visited defendant's office in Dallas several times for a discussion of matters pertaining to their tenancy of the land and had had letters from the bank, written on letterheads naming J. A. Mounts as its assistant secretary.

Mounts testified, in part, as follows:

"Q. By whom are you employed? A. Dallas Joint Stock Land Bank.

"Q. In what capacity? A. Assistant Secretary.

"Q. Do you have charge of any particular field department? A. I have numerous departments; I have a department in the accounting department with field men and collections and general correspondence.

"Q. You might say, generally, it is the accounting department; the real estate operating and field men? A. Yes.

"Q. Are you familiar with the Dean Loan, known as No. 0363? A. Yes.

578

"Q. When did you first meet Mr. Harrison or Mr. Allen? A. It was either in the fall of 1935 or spring of 1936.

"Q. At that time were they tenants on the land? A. Yes, they were authorized or instructed to take charge of the property in question about July or August, 1935.

"Q. As tenants of the land bank, are the lands which are operated by the bank through their tenants, are those in the department known as the real estate operations? A. Yes.

"Q. The relations with the tenants, are therefore in your charge? A. Yes.

"Q. These gentlemen were tenants of yours at that time? A. They had been told to take charge of the land in the spring of 1936. I came up here and was out to the property and saw the land and endeavored to get rental contract for that year.

"Q. Is it part of your duties to see whether tenants on land of the bank are good tenants so you can make a report as to the advisability of renting to them for another year? A. Partly, yes.

"Q. Is that the reason you came up here? A. I came on that duty as well as other duties. I came up here and they came in the office about the middle of May and signed the rental contract.

"Q. At that time was the question of selling this land to these gentlemen discussed? A. At the time they were in the office, I think I suggested that they buy the land. They remarked that they had thought of it, but it passed, so on June 14th, 1936, I wrote one of them or both of them that I would be in Clay County and I would like to talk to them about the crop and asked them to meet me at the Kemp Hotel, and I believe Mr. Allen came in Saturday afternoon and we talked briefly and I was out on the land on Sunday following and suggested that they buy the land and they talked interested and I went back to the office and made a report and wrote these gentlemen that Mr. Riley and I would be up on June 20th, and we, in turn, came to see them."

C. W. Riley, introduced as a witness for defendant, testified he was employed in the bank in its real estate department; that H. W. Ferguson was president of the bank and head of its land department, and all the field men in the land department were directly under him. He further testified he accompanied J. A. Mounts back to the land on Sunday, about June 21st, 1936; and on that occasion there was considerable discussion between Mr. Allen and Mr. Mounts and Mr. Harrison, also employees of defendant's bank, with regard to the sale of the land and whether or not it was leased, and witness said he told them it was his understanding a part of it was under lease but he could not say how much.

Testimony of plaintiff, Allen, was that on that occasion Mounts told him only 100 acres out of the north of the 440 acres was under lease, and that the remainder was free of a lease; he so informed plaintiff, Harrison. Both believed the statement to be true and but for reliance on the statement would not have agreed to the purchase of the land.

While the sales contract embodied a stipulation that it would not be valid until signed by the president or vice-president of the bank, and the resolution of defendant's Board of Directors authorized the sale of the land to be made by either its president, H. W. Ferguson, or its treasurer, H. O. Pool, yet there is an absence of any evidence to show that either the president, vice-president or treasurer of defendant conducted any of the negotiations with plaintiffs, which resulted in their contract to purchase or their acceptance of the deed. It is reasonably inferable that they executed the sales contract and also the deed without making any inquiry as to prior negotiations concerning the same.

From their failure to testify or introduce any evidence on that point, the jury would be warranted in indulging the inference, which would be of probative force, that the contract and sale were executed solely as the result of the negotiations therefor by J. A. Mounts.

"Usually the force of evidence, though slight, is greatly increased by the failure of the opposite party to rebut it, where it is obvious that the means are readily accessible to him. The failure of a party to take advantage of an opportunity to explain inculpatory circumstances is evidence against him, and his failure to produce evidence in his possession which might have rebutted a presumption against him strengthens such presumption. Where a party does not in any way seek to contradict the testimony of his adversary on a particular point, the presumption is that he has no testimony to controvert it; and when the proof tends to establish a fact,

and at the same time discloses that it is within the power and the interest of the opposite party to disprove it, the silence of the opposing party not only strengthens the probative force of the affirmative proof but of itself is clothed with a certain probative force." 17 Tex.Jur. para. 87, page 306.

Many authorities might be cited to the same effect, such as Barrera v. Gannaway, 130 Tex. 142, 105 S.W.2d 876, opinion by Justice Martin, Commission of Appeals; Farmers' Guaranty State Bank v. Burrus Mill & Elevator Co., Tex.Civ.App., 207 S.W. 400, and cases cited; Galveston H. & S. A. R. Co. v. Watson, Tex.Civ.App., 3 S.W.2d 921, and cases cited; 22 C.J. pages 115 to 118.

Appellant cites Dallas Joint Stock Land Bank v. Colbert, Tex.Civ.App., 98 S.W.2d 239, in which it was held that a vice-president has no inherent power, by virtue of his official position, to bind the corporation by a contract entered into by him for the corporation. Also Dallas Joint Stock Land Bank v. Cavitt, Tex.Civ.App., 93 S.W.2d 207, to the same effect. And other authorities of like effect are also cited, such as Southern Surety Co. v. Nalle & Co., Tex.Com.App., 242 S.W. 197; Cannel Coal Co. v. Luna, Tex.Civ.App., 144 S.W. 721; Wainwright-West Oils v. Cooke, Tex. Civ.App., 103 S.W.2d 847; Stockyards Natl. Bank of Fort Worth v. Alexander, Tex.Civ.App., 113 S.W.2d 288.

It is true that the position held by Mounts as assistant secretary did not of itself empower him to bind the defendant by his misrepresentations, but that fact did not preclude the bank from delegating to him authority to negotiate with plaintiffs for the sale of the land, subject to the approval of those officers who were by the Board of Directors given full power to make the sale on such terms as they might deem best.

It is sufficient to say that the facts involved in those cases distinguish them from this case.

For the reasons stated, we overrule the assignment of error now under discussion.

The record here shows the following agreement of the parties on the trial of the case:

"Mr. Andress (for defendant): It is agreed and stipulated between the parties that the defendant furnished to the plaintiffs, on or about July 14th, 1936, complete abstract of title showing all instruments of record affecting the title to the land in question, including therein Supplemental Abstract No. 5626, certified by Henrietta Abstract Company, on October 19th, 1933, containing at page two (2) thereof a full abstract copy of an oil and gas lease from the Dallas Joint Stock Land Bank to The Texas Company, dated October 13th, 1932, and showing such lease to have been filed for record February 15th, 1933, and recorded in Volume 109, page 414, of the Deed Records of Clay County, Texas.

"Mr. Stine (for plaintiff): May it be further stipulated that the abstracts delivered consisted of an original and a number of supplements, including this one, and that the entire abstract covered, or included or was composed of several hundred pages?.

"Mr. Andress: I am sure of that.

"Mr. Andress: Such abstract showing this oil and gas lease to have covered the entire 440 acres, being the subject matter of the contract between the parties hereto, for a primary period of ten years, with delay rentals after the expiration of one year from its date, in the amount of $110.00 semi-annually.

"Mr. Stine: And that the lease was of record in the Deed Records of Clay County, Texas, at the time we acquired our deed from the defendant.

"Mr. Stine: To make it perfectly plain, I would like it further stipulated that those delay rentals of twenty-five cents per acre, semi-annually, were to be paid in lieu of drilling operations, so that the commencement of a well might be deferred for six months at a time by the payment of rentals of $110.00 semi-annually."

Plaintiff, Harrison, testified that he read the sales contract before he signed it, and the deed before accepting it, including the provisions quoted above near the beginning of this opinion; he submitted no objections in writing or orally to the title; had the abstracts for more than 15 days; and when the bank notified him of its readiness to close the deal he did not call the contract off, nor reject the title; never examined the abstracts furnished nor the deed records; and did nothing at all to determine whether or not the title to the land was good. According to his further testimony, he did not discover that the lease in favor of The Texas Company covered the entire 440 acre tract until some six months after delivery of the deed; he was

induced to accept the deed and execute the notes given in consideration therefor, relying upon the representation of J. A. Mounts that only 100 acres out of the north portion of the tract was under an oil and gas lease.

Testimony of plaintiff Allen was substantially to the same effect as that of Harrison, just noted.

Appellant presents this, its first, proposition: "An abstract of title having been furnished the appellees who were the buyers of the real estate under a contract providing that the seller furnish such abstract of title and where the contract further provides: 'The buyer agrees to submit in writing his objections, if any, to said title within fifteen days from the receipt thereof' and 'in the event the seller does not own all the minerals it shall not be required to warrant the title to more than it owns * * *'. And the buyer made no objections but returned the contract after some two weeks and the sale is closed, the appellees, buyers, have no cause of action based on alleged misrepresentations, as to the amount of land covered by an oil lease, made months before the contract was signed."

In Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808, 811, this is said: "When once it is established that there has been any fraudulent misrepresentation * * * by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by proper inquiry. He has a right to retort upon his objector: 'You, at least, who have stated what is untrue, * * * for the purpose of driving me into a contract, cannot accuse me of want of caution because I relied implicitly upon your fairness and honesty.'"

That announcement has been quoted and followed in a vast number of decisions cited in 20 Tex.Jur., under para. 34, page 58, including: Buchanan v. Burnett, 102 Tex. 492, 119 S.W. 1141, 132 Am.St.Rep. 900; Thrower v. Brownlee, Tex.Com.App., 12 S.W.2d 184; Al Parker Securities Co. v. Owen, Tex.Com.App., 1 S.W.2d 271; Graves v. Haynes, Tex.Com.App., 231 S. W. 383; Griffeth v. Hanks & Collins, 46 Tex. 217; Gardner v. Dorsey, Tex.Civ.App., 272 S.W. 266, error dismissed; Hull-Tex. Oil Ass'n v. Pipes, Tex.Civ.App., 240 S.W. 994; Wisegarver v. Yinger, Tex.Civ.App., 128 S.W. 1190, error refused; Western Cottage Piano & Organ Co. v. Anderson, 45 Tex.Civ.App. 513, 101 S.W. 1061, error

refused, and numerous other decisions to the same effect, cited in support of the announcement of the same rule in 20 Tex. Jur. para. 35, page 60.

And in a suit for actual damages, only, as in the suit at bar, that rule is applicable even though the representation was innocently made. Guaranty Bond State Bank v. Kelley, Tex.Com.App., 13 S.W.2d 69; Freshwater v. Hoyt, Tex.Com. App., 259 S.W. 923, and other decisions cited in 20 Tex.Jur., page 59.

We quote the following from para. 45, 20 Tex.Jur. page 75: "An unqualified expression of ownership is an affirmation of fact, notwithstanding it may involve an opinion as to the legal sufficiency of the evidence of title. Particularly is this true where the representation is made to one ignorant on the subject of land titles and in order to prevent inquiry. That the representation was innocently made does not affect the right to relief. With respect to the purchaser's right to rely on the representations, no legal duty rests on him to search the records or otherwise to exercise diligence in ascertaining their falsity, unless the facts show that he was charged with notice as to the adverse rights."

We quote also the following from 43 Tex. Jur. para. 39, page 64: "With respect to its subject matter, a representation made in connection with a contract for the sale of real property may have reference to any matter which is material to the transaction. * * *

"On the part of the vendor, a misrepresentation of consequence may consist in a statement as to the condition, location, quality, or quantity of the property sold. It may pertain to the accessibility of the property to a highway, street or railroad, or to the availability of water or the right of the purchaser thereto. Or it may refer to the cost or value of the property, the title of the vendor, or the non-existence of encumbrances."

In support of the assignment, appellant cites Donoho v. Hunter, Tex.Com.App., 287 S.W. 47; Stern v. Maxwell, Tex.Civ.App., 44 S.W.2d 482; Jones v. Herring, Tex.Civ. App., 16 S.W.2d 325; Staben v. Hernandez, Tex.Civ.App., 292 S.W. 259.

In some of those cases it appeared that at the time of the transaction the party complaining of fraudulent representation had knowledge of facts which in law amounted to notice of the falsity of the representa-

tion; in others, that the complainant undertook an investigation of the truth of the representation before acting thereon. In either of which instances they could not be heard to say they relied solely on the misrepresentation of the other party. Announcement of that rule appears in 20 Tex. Jur. pages 60 to 68, inclusive, and decisions there cited.

But it is our conclusion that the decisions in Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808; Buchanan v. Burnett, 102 Tex. 472, 119 S.W. 1141, 132 Am.St.Rep. 900; Al Parker Securities Co. v. Owen, Tex.Com. App., 1 S.W.2d 271; Graves v. Haynes, Tex.Com.App., 231 S.W.' 383; Smith v. Fort, Tex.Civ.App., 58 S.W.2d 1080, and numerous other decisions cited in 20 Tex. Jur. para. 34, page 58, are controlling here.

Article 1297, Rev.Civ.St., reads: "From the use of the word 'grant' or 'convey,' in any conveyance by which an estate of inheritance or fee simple is to be passed, the following covenants, and none other, on the part of the grantor for himself and his heirs to the grantee, his heirs or assigns, are implied, unless restrained by express terms contained in such conveyance:

"1. That previous to the time of the execution of such conveyance the grantor has not conveyed the same estate, or any right, title or interest therein, to any person other than the grantee.

"2. That such estate is at the time of the execution of such conveyance free from incumbrances.

"Such covenants may be sued upon in the same manner as if they had been expressly inserted in the conveyance."

■ Defendant's deed to plaintiffs stipulated that it "granted, sold and conveyed" the 440 acres in controversy without excepting therefrom the oil lease it had executed to The Texas Company. The general warranty of title "against any person whomsoever claiming or to claim the same or any part thereof, except any mineral interest which grantor does not own", did not operate to except from the conveyance that oil lease. Texas & Pacific R. Co. v. El Paso & N. E. R. Co., Tex.Civ.App., 156 S.W. 561, error refused; 12 Tex.Jur., pages 36 to 41, inclusive, and decisions cited; Parish v. White, 5 Tex.Civ.App. 71, 24 S.W. 572; Askew v. Bruner, Tex. Civ.App., 205 S.W. 152.

■ Nor can it be said that that reservation from the warranty of title in the deed to them was notice that the representation by J. A. Mounts to the effect that 340 acres of the tract was free of any oil lease, was untrue. On the contrary, plaintiffs could reasonably assume that even though the whole 440 acre tract had theretofore been covered by the lease made more than four years prior, it was no longer effective as to 340 acres, by reason of nonpayment of rentals or as the result of an unrecorded release good as between the parties, and that the exception from the warranty clause had reference only to the 100 acres which Mounts represented was still covered by that lease.

■ It is a well recognized general rule that possession of real estate is prima facie notice to a proposed purchaser of claim of title thereto, as announced in Payton v. Loustalott, Tex.Com.App., 53 S.W.2d 1012; Perminan Oil Co. v. Smith, 129 Tex. 413, 107 S.W.2d 564; Humble Oil & Refining Co. v. Wilcoxon, Tex.Civ. App., 70 S.W.2d 218.

■ And in a suit of trespass to try title, plaintiff makes out a prima facie case by showing prior possession in absence of evidence to show title in the defendant. 41 Tex.Jur. para. 61, page 506. Notwithstanding that rule of decisions in Olschewske v. King, 43 Tex.Civ.App. 474, 96 S.W. 665, 666, error refused, the Court of Appeals affirmed a judgment in favor of plaintiff for rescission of a sale to him by the defendant, for recovery of consideration paid and cancellation of money notes, because of misrepresentation of the seller that he had a perfect title to the land and could deliver immediate possession, which induced the plaintiff to buy. It appeared that at the time of the conveyance, Mrs. Somervill and her minor children were in possession of the land, and subsequently in their suit against plaintiff, title was awarded to the minors, following which plaintiff's suit against the seller was instituted. We quote the following from the opinion in that case:

"It is well settled that one who buys land in possession of another will not, as to such possessor, be heard to say that he purchased without notice of the possessor's title, but is charged with constructive notice of whatever right or title the possessor has in the property; possession being as conclusive evidence of notice as is the

582

registration of a deed under the statute. Under this rule appellee could not claim as against the Somerville heirs that he did not purchase with notice of their title, but it cannot be held as matter of law that, because he was charged with notice of their title, he could not have relied upon the representation of appellant that he owned the property and would put him in possession of it. The trial court found that such representations were made by the appellant and were relied on by the appellee. There is no statement of facts in the record, and the findings of fact by the trial court must be conclusively presumed to be supported by the evidence."

Under the authorities cited, there is no merit in the assignment now under discussion.

For the reasons noted, all assignments of error are overruled, and the judgment of the trial court is affirmed.